**PHILLIPS OIL COMPANY,**
**Plaintiff-Appellee,**
**v.**
**OKC CORPORATION, et al.,**
**Defendants-Appellants.**

No. 86–3322.
United States Court of Appeals,
Fifth Circuit.

March 17, 1987.
Rehearing Denied April 17, 1987.

Gene W. Lafitte, John M. Wilson, Joe B. Norman, Liskow & Lewis, New Orleans, La., for defendants-appellants.

Kennedy J. Gilly, Jr., Charles D. Marshall, Jr., Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for plaintiff-appellee.

Before RANDALL, JOHNSON and JONES, Circuit Judges.

RANDALL, Circuit Judge:

Appellant, OKC Corporation ("OKC"), appeals from the district court's grant of partial summary judgment in favor of appellee, Phillips Oil Company ("Aminoil"),[1] and the decision in favor of Aminoil on trial of the accounting portion of the action. We affirm.

## I.

On July 1, 1967, Aminoil, with three partners, acquired from the United States a lease covering an area in the Gulf of Mexico known as South Pass Block 89 ("Block 89"). Aminoil and its partners, known collectively as the SLAM Group, each acquired a ¼ working interest in Block 89.

According to OKC, from 1967 to 1977, exploratory wells drilled on Block 89 revealed the presence of hydrocarbon reserves having only marginal economic value. As of early 1977, those reserves thought to be recoverable were considered

---

**1.** After the instant lawsuit was instituted, plaintiff-appellee, Aminoil, USA, Inc., changed its name to Aminoil, Inc. Thereafter, Aminoil, Inc. merged with Phillips Oil Company, which subsequently merged with Phillips Petroleum Company. We will refer to plaintiff-appellee as "Aminoil."

to be located in the northeast portion of Block 89.

In 1976, the operator of Block 89 for the SLAM Group, Marathon Oil Company ("Marathon"), proposed installation of a platform, designated as Platform A, in the northeast portion of Block 89 to drain the known reserves. According to OKC, development of the block in the area south of the platform was not anticipated.

Prior to Marathon's proposal, Aminoil had conducted internal reviews of geological data pertaining to Block 89. According to OKC, this information suggested that there were approximately four million barrels in "proven" and "potential" oil reserves in the area where Platform A was to be located. Another four million barrels were considered "possible," but the possibility of recovering them was "poor." According to OKC, Aminoil believed that even these "possible" reserves were located in the area to be drained by Platform A wells.

Based on its economic review, Aminoil chose not to participate in the proposed installation of Platform A or in the costs of further development. Instead, Aminoil decided that it would "farm out" its interest in Block 89 to a party willing to bear the construction costs of Platform A in exchange for the acquisition of an investment in the Block 89 lease.

In consideration of certain obligations to be undertaken by OKC, and subject to the reservation of an overriding royalty which was convertible to an escalating net profits interest, Aminoil "farmed out" its entire ¼ working interest in Block 89 to OKC under a written agreement ("the Farmout") exe-

cuted June 14, 1977. Aminoil and OKC subsequently executed, on July 11, 1977, an "Assignment of Interest in Oil and Gas Lease," pursuant to the Farmout.[2]

Discussions concerning a possible farmout of Aminoil's interest in Block 89 began sometime in the fall of 1976 or the early months of 1977. According to OKC, at their first meeting, officials of OKC and Aminoil discussed the opportunity for OKC to acquire Aminoil's interest in Block 89 but did not discuss the reservation by Aminoil of any interest in the property. According to OKC, negotiations continued after the first meeting, with Aminoil representative, Harry Fisher, for the first time advising OKC representative, Gary Adams, that Aminoil wanted to retain an overriding royalty interest convertible upon payout of Platform A to a net profits interest in production from Platform A.

Adams advised OKC President Cloyce Box of Aminoil's desire. According to OKC, Box discussed the matter with Aminoil's George Dawson who proposed assigning to OKC Aminoil's entire interest in Block 89, subject to Aminoil's retention of an interest in production from Platform A, in return for OKC's assumption of Aminoil's cost obligations with regard to the Block. Box agreed to the proposal and according to OKC, no further communications occurred between the parties concerning different terms. A telex, dated March 25, 1977, was prepared by Aminoil, outlining the text of a letter of intent to be executed by the parties. In the telex, Aminoil described its retained interest with specific reference to Platform A.[3] The telex

---

**2.** In 1977, OKC Corporation was a publicly held corporation whose stock was traded on the New York Stock Exchange. In May of 1981, OKC Corporation concluded a corporate liquidation. Its assets, including the interest in Block 89, were transferred to OKC Limited Partnership, which is also a defendant in this case. OKC Corporation's interest in this lawsuit was transferred to OKC Limited Partnership. The parties stipulated that any judgment in this case applies equally to OKC Corporation and OKC Limited Partnership.

Subsequent to entry of judgment in the district court, OKC Corporation filed a petition under Chapter 11 of the Bankruptcy Code. Upon inquiry by this court into the question of

what effect, if any, the automatic stay had on continuation of this lawsuit, counsel for OKC noted that there are two defendants in this lawsuit: OKC Corporation and OKC Limited Partnership. Both defendants filed notices of appeal from the district court's judgment. Counsel for OKC concluded that under section 362(a)(1) of the Bankruptcy Code, OKC Corporation's appeal is stayed. However, OKC Limited Partnership is unaffected by the stay of proceedings against OKC Corporation.

**3.** The telex read, in part:

5. Aminoil will retain an overriding royalty interest equal to one-twelfth (1/12) of one fourth (¼) of eight-eighths (8/8) until payout

concluded with the representation that Aminoil would "enter into a farmout agreement which incorporates the aboe [sic] conditions and such other conditions as the parties agree are appropriate." Aminoil undertook to draft the required documents.[4]

On May 11, 1977, the proposed Farmout was delivered to OKC, under the letter of Aminoil's Roger Edwards. Under the terms of the proposed Farmout, Aminoil agreed to assign its entire ¼ interest in the Block 89 lease to OKC, subject to Aminoil's reservation of an overriding royalty convertible to an escalating net profits interest as provided in Paragraph IV of the proposed Farmout:

> Aminoil shall reserve to itself from the interest to be assigned under the terms of this agreement, an overriding royalty interest equal to one-twelfth (¹⁄₁₂) of one-fourth (¼) of eight-eighths (⁸⁄₈) of production, until "net profits" are received as the term is defined hereafter, at which time Aminoil's overriding royalty interest shall automatically convert to a net profits interest equal to twenty percent (20%) of one-fourth (¼) of eight-eighths (⁸⁄₈) of production, until recovery from first production from the subject lease of four million (4,000,000) gross barrels of oil, condensate and/or gas equivalent based on ten (10) MCF of gas equaling one (1) gross barrel of oil and/or condensate; thereafter Aminoil's net profits interest shall be increased to thirty-three percent (33%) of one-fourth (¼) of eight-eights (⁸⁄₈).

Over a period of nearly five weeks, the proposed Farmout was reviewed by various OKC officials.[5]  On June 14, 1977, OKC's

---

of Platform A and all wells drilled therefrom including production facilities.

6.  Upon payout, Aminoil's overriding royalty interest will automatically convert to a net profits interest equal to twenty percent (20%) of one-fourth (¼) of eight-eighths (⁸⁄₈) until recovery from first production of four million gross barrels of oil, condensate and/or gas equivalent based on 10 MCF equaling one gross barrel of oil and/or condensate; thereafter, Aminoil's net profits interest shall be increased to thirty-three percent (33%) of one-fourth (¼) of eight-eighths (⁸⁄₈).

4.  OKC, in its brief to this court, says that analysis of the drafting revisions leading to the final version of the Farmout shows the error committed in the Farmout's preparation.  Detailing the drafting process, OKC shows that the three initial drafts of the Farmout speak of Aminoil's reserved interest and/or "net profits" with specific reference to Platform A.  The fourth draft for the first time defines Aminoil's net profits interest as a portion of "first production from subject lease," and contains the definition of net profits found in the Farmout: "Aminoil shall look exclusively to the oil, gas, condensate, and other hydrocarbons, and all minerals produced from the subject lease for the satisfaction and realization of the net profits interest."  According to OKC, Aminoil never advised OKC of the revisions being considered at Aminoil.

5.  Prior to his employment with OKC, OKC's General Counsel, Dan McAllen, worked in the legal department of Gulf Oil Corporation where for more than two years he examined, drafted, and reviewed contracts by which mineral interests are assigned and transferred, known in the oil and gas industry as farmouts and farmins, on a weekly basis.  He was familiar with the concept of a farmout and reserved interests.

Upon receipt of the proposed Farmout, McAllen directed a memorandum, dated May 12, 1977, to Norman Smith, OKC's Vice-President of Operations, requesting that Smith review the proposed Farmout and advising that he was also forwarding the Farmout to OKC's James Fajack and Gary Adams for their review.  Smith held a business degree and a law degree and also had prior experience in oil and gas transactions.  Fajack was OKC's Vice-President for Finance and its chief financial officer since 1972.  Prior to his employment with OKC, Fajack, a CPA, had been manager of Ernst & Whinney's audit staff in New York where his major clients were British Petroleum and REA Express.

The proposed Farmout was also reviewed by P.J. Gaitonde, OKC's controller.  Gaitonde, also a CPA, holds an MBA.  Gaitonde, at Fajack's request, was particularly concerned with Aminoil's reserved overriding royalty and net profits interest.  He prepared a memorandum dated May 16, 1977, which contained his statement that "Aminoil retains an overriding royalty interest of ¹⁄₁₂ of OKC's interest (25%) until 'net profits' is achieved."

On June 14, 1977, McAllen drafted a memorandum to OKC's Executive Vice President, Gary Adams, advising him that the terms of the proposed farmout were satisfactory for execution:

> Please be advised that I have examined the captioned Farmout Agreement, and the agreement is satisfactory for execution by OKC Corp.  I have furnished a copy of the farmout letter to Jim Fajack and Norman Smith and asked them to review the agreement.  Jim has advised that the net profits interest calcula-

Executive Vice President, without reading the Farmout himself, executed the Farmout without making any changes in the document that had been submitted by Aminoil to OKC for approval. On July 11, 1977, Norman Smith, one of the OKC employees who had reviewed the Farmout, accepted the assignment of one-quarter interest in Block 89 by virtue of the "Assignment of Interest in Oil and Gas Lease" subject to the Farmout.

From 1977 to 1980, exploratory wells were drilled in the southern portion of Block 89 and substantial accumulations of hydrocarbons were discovered. In 1980, the fabrication and installation of a development platform, Platform B, in the southern portion of Block 89 were proposed.

The instant controversy arose in February of 1981 when OKC, in aid of its liquidation,[6] mailed a public bid letter to various oil and gas companies, including Aminoil. The bid letter suggested that Aminoil's reserved interest was restricted to Platform A in the northern portion of Block 89, instead of the entirety of Block 89 (including Platform B). Following its receipt of OKC's bid letter, Aminoil filed the instant action against OKC seeking a declaratory judgment that Aminoil's reserved interest under the Farmout applied to the entirety of the Block 89 lease and all production therefrom, and for an accounting on that basis. The action was filed in federal district court on the basis of diversity jurisdiction.

Aminoil's complaint alleged that its reserved overriding royalty and net profits interest was effective as to *all* production from the subject lease, that this was disputed by OKC, and that Aminoil was entitled to a declaratory judgment in accordance with its interpretation of the agreements. OKC denied the correctness of

Aminoil's interpretation of the Farmout and counterclaimed alleging error and seeking reformation of the Farmout to conform with OKC's argument that Aminoil's reserved interest was restricted to production from Platform A. OKC asserted that the mutual intent of the parties under the Farmout and Assignment was that Aminoil's reserved overriding royalty and net profits interest did not apply to production from the entire lease, but rather, only to production from Platform A.

Aminoil responded to OKC's counterclaim, contending that the Farmout clearly and unambiguously reflected the parties' understanding and mutual intention that Aminoil's reserved interest would apply to the entire lease and all production therefrom. Additionally, Aminoil alleged that if OKC were in error as to the extent of Aminoil's reserved interest, such error was the result of OKC's own negligence, fault, or inattentiveness in reviewing, or failing to review, the Farmout.

Aminoil moved for partial summary judgment and also filed a motion *in limine* to exclude parol evidence to be offered by OKC.[7] By minute entry dated July 27, 1984, the district court granted both motions. The court found that Aminoil's reserved interest applied to all production from the entirety of Block 89, saying that "the intent of the parties with regard to the scope of Aminoil's reserved interest is set forth in a clear, consistent and extensive manner which leaves no doubt as to what was intended." Minute Entry at 6. The court concluded that:

insofar as the scope of Aminoil's reserved overriding royalty and net profits interest, the Farmout and Assignment are clear, unambiguous and complete and, under controlling legal principles, parol evidence is inadmissible to vary or

---

tion contained in the agreement is satisfactory from the standpoint of OKC, and Norman had no comments.

Cloyce Box, President, Chairman of the Board and chief executive officer of OKC, and Leo Wright, OKC's geologist, testified that they reviewed the Farmout immediately prior to or after its execution.

**6.** *See supra* note 2.

**7.** The motion for partial summary judgment had been denied in March of 1983 and was reurged at the pretrial conference held on March 28, 1984. The motion to exclude parol evidence was also reurged at the pretrial conference, having been argued on December 7, 1983, and continued to the time of trial.

modify the words of the contract or to prove an intent different than that which is unmistakably and clearly stated in the contract.[8] Because, as a matter of fact and law, the Farmout and Assignment provide that Aminoil's reserved interest shall apply to the entirety of Block 89, summary judgment is appropriate on these grounds alone....

Additionally, this Court finds that a review of the undisputed circumstances surrounding the execution of the Farmout confirms Aminoil's contention that the clear language of the Farmout expresses the true intent of the parties, and precludes any reasonable probability of error.

... after first executing the Farmout after extensive review and analysis without requesting a single change, OKC again expressly ratified that same Farmout several weeks later.

Minute Entry at 14–15 (footnote omitted). The court added that:

If OKC was in error during the negotiations, whether by its own fault or otherwise, the circumstances surrounding the execution of the contract lead this Court to conclude that there can be no legitimate dispute that OKC was not, or should not, have been laboring under that error, however caused, after reviewing the Farmout for five weeks. OKC cannot possibly carry its burden of proving that it was somehow misled by Aminoil and the Court's conclusion in this respect provides an equally strong and additional basis for granting Aminoil's partial summary judgment. Further-

more, established legal principles which are also applicable to these facts preclude any such claim by OKC; *Hope v. Barham,* [28 F.Supp. 561 (W.D.La. 1939)].

Minute Entry at 19.

The district court ordered OKC to render an accounting to Aminoil for all proceeds of production attributable to Aminoil's overriding royalty interest and net profits interest in accordance with the court's construction of the Farmout.

OKC's accounting was served on Aminoil on September 18, 1984, and Aminoil, through the report of its retained accountants from the accounting firm of Price Waterhouse & Co., excepted to the accounting, taking issue with one of the credits and several of the charges made by OKC against net profits. Pursuant to the provisions of Rule 706 of the Federal Rules of Evidence, the district court appointed its own expert witness who submitted a written report and thereafter was deposed.

Prior to trial of the accounting phase of the lawsuit, OKC and Aminoil resolved all issues under the accounting except two charges made by OKC to the net profits account: (1) a $29,666,997 interest charge;[9] and (2) a $514,728 charge for legal expenses incurred in connection with the instant lawsuit. OKC contended that it was entitled under the Farmout to recoup these amounts from production from the lease before Aminoil's overriding royalty converted to the net profits interest.

Trial of the accounting issues was held on November 1, 1985.[10] By stipulation of

---

**8.** The court opined that "[p]arol evidence is inadmissible to vary, modify or explain the provisions of a contract which is complete on its face as to intent and purpose." Minute Entry at 11. The court continued:

In this case, insofar as the scope of Aminoil's reserved interest is concerned, Aminoil and OKC did *not* fail to clearly state their intent nor did they state it ambiguously, or incompletely, rather their intent, in all pertinent respects, could not have been stated more clearly. Insofar as the scope of Aminoil's interest the Farmout is complete and parol evidence is inadmissible.

Minute Entry at 12.

**9.** Of the $29,666,997 in interest which OKC claimed was chargeable against the net profits account, $7,900,000 was incurred for capital borrowed by OKC and attributable to costs of exploratory and developmental operations on, and production of minerals from, Block 89. The remainder of the total interest figure, $21,766,997, is imputed interest or the time value of money utilized by OKC to participate in operations on, and production of minerals from, Block 89, calculated at the rates and by the methodology reflected in the net profits accounting.

**10.** The parties both conceded that the accounting issues would be resolved by application of

the parties, subject to objection by OKC as to certain portions of the testimony, testimony of the court's expert was introduced by way of his deposition. Aminoil called two Price Waterhouse & Co. partners to testify at trial. They were accepted by the district court as experts in oil and gas accounting. The testimony of the experts was to the effect that the charges against the net profits account for interest and litigation expenses related to the instant lawsuit were not properly made by OKC. OKC offered no testimony or evidence at trial in support of its net profits accounting and no evidence in contravention of the testimony of the experts. Instead, OKC simply objected to the admission of expert testimony. By Findings and Conclusions entered on March 6, 1986, the district court rejected OKC's contentions, and held that, under the net profits accounting provisions of the Farmout, the interest and litigation expenses were not chargeable against the net profits account.

Judgment consistent with the granting of Aminoil's motion for partial summary judgment and the decision on the trial of the accounting portion of the action was rendered on April 8, 1986. This appeal followed.

## II.

On appeal, OKC argues that the district court erred in granting partial summary judgment in favor of Aminoil. OKC contends that established Louisiana jurisprudence allows the use of parol evidence in support of a reformation claim, even when a contract is clear and unambiguous on its face, and argues that, in this case, admissible parol evidence shows an antecedent agreement and a material variance between that agreement and the Farmout eventually signed. Therefore, argues OKC, summary judgment was improper.

OKC contends that, contrary to the district court's conclusion that "a review of the undisputed circumstances surrounding the execution of the Farmout confirms Am-

inoil's contention that the clear language of the Farmout expresses the true intent of the parties, and precludes any reasonable probability of error," Minute Entry at 14, there is a genuine issue of material fact created by the circumstances leading up to the execution of the Farmout. According to OKC, "[t]he critical and disputed issue in this case is whether prior to the execution of the written contract, there existed an antecedent contract between the parties, which, as a result of mutual error, was incorrectly reduced to writing." Original Brief of Defendants-Appellants at 28. OKC argues that, viewing the evidence in the light most favorable to OKC (as we do in considering the propriety of the grant of summary judgment),[11] the existence of a genuine issue of material fact is clear. According to OKC, evidence—both oral and written—shows that there was an antecedent agreement which was incorrectly reduced to writing as a result of mutual error:

At the time of the negotiations between Aminoil and OKC, Aminoil was anxious to escape its then pending cost obligations attributable to the lease. In fact, Aminoil's original proposal was to transfer its full interest in consideration of OKC's assumption of those obligations. Subsequently, that proposal was modified to allow for Aminoil's reservation of an overriding royalty *convertible upon payout from Platform A production of the costs and expenses of Platform A and its wells to a net profits interest in Platform A production.* Ultimately, OKC orally agreed to this proposal, and there were no further communications between the parties concerning different terms....

Aminoil's retention of an interest only in Platform A production made perfect sense. The only known recoverable reserves on the Block were located in the area to be drained by Platform A. Further, Platform A was the only platform contemplated for installation by the SLAM partners. No thought at that

---

the net profits accounting provisions of the Farmout.

**11.** *See* discussion *infra* at Part IIA.

time was being given to the location of another Platform in other areas of the Block....

The existence of a prior agreement between OKC and Aminoil limiting Aminoil's retained interest to production from Platform A is also reflected in the documents prepared by Aminoil prior to the execution of the farmout agreement. In the March 25, 1977 telex, Aminoil represented and agreed that it would enter into a farmout agreement which "incorporates" the conditions set forth in the telex. Despite this, there is a major material variance between the farmout agreement drafted by Aminoil and the March 25, 1977, telex, which also was drafted by Aminoil. This material variance developed during Aminoil's internal drafting process.

Original Brief of Defendants-Appellants at 28–29. OKC argues further that the reformation claim is not barred by negligence because mutual error, not unilateral error, was alleged. Finally, OKC contends that there was no showing that OKC had the requisite knowledge to ratify the Farmout by subsequently executing the assigned agreement. We turn now to a consideration of OKC's contentions.

### A.

As a matter of federal procedural law,[12] the granting of summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper when, viewed in the light most favorable to the party opposing the motion, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.[13] *See, e.g., Anthony v. Petroleum Helicopters, Inc.,* 693 F.2d 495, 496 (5th Cir.1982). On review, this court applies the same legal standard applied by the district court to determine whether summary judgment was appropriate. *See, e.g., id.* at 496. The party

opposing the motion is to be given the benefit of all reasonable doubt in determining whether a genuine factual issue exists. *See, e.g., Kellerman v. Askew,* 541 F.2d 1089, 1092 (5th Cir.1976); *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1031 (5th Cir.1982). In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences most favorable to the party opposing the motion" for summary judgment. *Faloona v. Hustler Magazine,* 799 F.2d 1000, 1004 (5th Cir.1986); *see, e.g., Anderson v. Liberty Lobby, Inc.,* — U.S. —, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Harrison v. Byrd,* 765 F.2d 501 (5th Cir. 1985); *Southmark Properties v. Charles House Corp.,* 742 F.2d 862 (5th Cir.1984).

In its recent opinion in *Anderson v. Liberty Lobby, Inc., supra,* the United States Supreme Court, undertaking an extensive examination of the summary judgment standard, noted that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby,* 106 S.Ct. at 2510 (emphasis in original); *see also St. Amant v. Benoit,* 806 F.2d 1294, 1296–97 (5th Cir.1987).

▮ With regard to "materiality," only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment. Factual disputes that are irrelevant or that are unnecessary will not be counted. *Liberty Lobby,* 106 S.Ct. at 2510.

▮ With regard to "genuineness," the inquiry performed is a threshold inquiry of whether there is a need for a trial, that is, whether "there are any genuine factual

---

**12.** The standard to be applied is a federal standard. *See Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *see also Lighting Fixture & Elec. Supply Co. v. Continental Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir.1969).

**13.** Rule 56(c) provides, in relevant part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
Fed.R.Civ.P. 56(c).

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 2511. No genuine issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a factfinder to find for that party. *See id.*

Considering the specific question posed by the case before it—whether the clear and convincing evidence requirement must be considered by a court ruling on a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure—the Court in *Liberty Lobby* concluded that the inquiry involved in ruling on a summary judgment motion "necessarily implicates the substantive evidentiary burden of proof that would apply at the trial on the merits." *Id.* at 2512. In the context of the libel suit before it, the Court said:

> When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.* For example, there is no genuine issue if

the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

*Id.* at 2513. Therefore, "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden," *id.*, that the parties must bear at trial.[14] The Supreme Court did caution, however, that, at the summary judgment stage of a case, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 2511. The Court stated that its holding that the substantive evidentiary burden should be taken into account in ruling on summary judgment motions "does not denigrate the role of the jury.... Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," *id.* at 2513, not the function of the judge ruling on a summary judgment motion.[15]

---

**14.** The Court reasoned that:

This conclusion is mandated by the nature of this determination. The question here is whether the jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Liberty Lobby,* 106 S.Ct. at 2513.

**15.** It should be recognized that there was no request for a jury trial in this case. In this regard we note that this circuit has arguably articulated an even more lenient standard for summary judgment in certain nonjury cases. A panel of this court, in *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis,* 799 F.2d 218 (5th Cir.1986), after noting that the Supreme Court has said that the standard for summary judgment mirrors the standard for directed verdict under Fed.R.Civ.P. 50(a) (citing *Liber-*

*ty Lobby,* 106 S.Ct. at 2511, and *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) commented that, "in the same fashion, in nonjury cases it mirrors the standards for dismissals provided by Rule 41(b)." *Professional Managers,* 799 F.2d at 223.

Rule 41(b) of the Federal Rules of Civil Procedure provides, in relevant part, that:

After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

Fed.R.Civ.P. 41(b). "A dismissal under Rule 41(b) differs from a directed verdict in a jury trial in that the court need not determine that the defendant is entitled to judgment as a matter of law." *DuPont v. Southern Nat. Bank,* 771 F.2d 874, 879 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1467, 89 L.Ed.2d 723 (1986) (citation omitted). "Instead, as the finder of fact, the court may resolve disputed issues of fact. A Rule 41(b) dismissal is warranted when the district court, even before hearing the de-

With this guidance from the Supreme Court in mind, we now turn to consider the propriety of the district court's grant of partial summary judgment in favor of Aminoil.

## B.

■■■ Under Louisiana law,[16] the equitable remedy of reformation of a contract is available to parties "if the instrument recites terms to which neither party agreed." *Valhi, Inc. v. Zapata Corp.*, 365 So.2d 867, 870 (La.App. 4th Cir.1978). The reformation remedy "lies only to correct mistakes or errors in the written instrument when such instrument, as written, does not express the true contract or agreement of the parties." *Fontenot v. Lewis*, 215 So.2d 161, 163 (La.App.3d Cir. 1968). The error or mistake must be mutual. *See, e.g., Southwest Gas Producing Co. v. Hattie Bros.*, 230 La. 339, 353, 88 So.2d 649, 654 (1956); *Amoco Production Co. v. Texaco, Inc.*, 415 So.2d 1003, 1007 (La.App.4th Cir.1982). An action to reform a written instrument "is a personal action, even when applied to real estate, and the burden of proof rests on the one seeking reformation of the instrument to establish the mutual error and mistake by *clear* and *convincing proof*, parol evidence being admissible for this purpose." [17] *Id.* (emphasis added) (citing *Agurs v. Holt*, 232 La. 1026, 95 So.2d 644 (1957); *Southwest Gas Producing Co. v. Hattie Bros.*, 230 La. 339, 88

---

fendant's evidence, determines that the plaintiff has failed to offer persuasive evidence regarding the necessary elements of his case." *Id.* Under Rule 41(b), the district court is "entitled to weigh evidence, make credibility judgments, and draw inferences unfavorable to the plaintiffs." *North Mississippi Communications, Inc. v. Jones*, 792 F.2d 1330, 1333 (5th Cir.1986) (footnote omitted); *see also Weissinger v. United States*, 423 F.2d 795, 798 (5th Cir.1970) (en banc).

In a line of cases dealing with summary judgment in the nonjury context, panels of this court have discussed the inquiry to be performed when summary judgment is sought. In a case wherein the court found that the parties did not request a jury trial, the panel stated that while a certain question is considered one of "fact" under state law, " 'to be judged in light of all the circumstances surrounding a given transaction,' ... a federal district court may nevertheless grant summary judgment on such an issue, in a non-jury case, if the '*evidentiary* facts are not disputed ... [and] trial would not enhance [the court's] ability to draw inferences and conclusions,' *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir.1978) (emphasis added)." *Houston North Hosp. Properties v. Telco Leasing, Inc.*, 680 F.2d 19, 22 (5th Cir.) (footnote and citations omitted), *reh'g denied in part, granted in part*, 688 F.2d 408 (1982). The court has also stated that:

Summary judgment may be improper, even though the basic facts are undisputed, if the ultimate facts in question are to be inferred from them, and the parties disagree regarding the permissible inferences that can be drawn from the basic facts. *Winter v. Highlands*, 5 Cir.1978, 569 F.2d 297, 299. " '[T]he choice between permissible inferences is for the trier of facts.' " *Nunez v. Superior Oil Co.*, 5 Cir. 1978, 572 F.2d 1119, 1124, quoting, *Walker v. U.S. Gypsum Co.*, 5 Cir.1959, 270 F.2d 857, 862, *cert. denied*, 1960, 363 U.S. 805, 80 S.Ct.

1240, 4 L.Ed.2d 1148. Where a jury is called for, the litigants are entitled to have the jury choose between conflicting inferences from basic facts. *Nunez, supra*, 572 F.2d at 1124. However, where the judge is the trier of fact, as was the case here, he may be in a position to draw inferences without resort to the expense of trial, unless there is an issue of witness credibility. *See id.* at 1124–25.

*Alabama Farm Bur. Mut. Cas. Co. v. American Fid. Life Ins. Co.*, 606 F.2d 602, 609–10 (5th Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980).

Whether or not these cases set forth a "nonjury summary judgment standard" different from the summary judgment standard applied in jury cases and, if so, whether it has been universally and consistently applied in nonjury summary judgment cases are not questions we need decide here. Since we can affirm the judgment of the district court in this case on the basis of the general summary judgment standard set forth in a long line of cases in this circuit and in *Liberty Lobby*, we merely note the question of whether a different and arguably more lenient summary judgment standard should apply in nonjury cases.

**16.** Because subject matter jurisdiction in this case is founded on diversity of citizenship, the case is controlled by Louisiana law.

**17.** Because of our disposition of this case, we need not address OKC's claim that the district court erred in granting Aminoil's motion *in limine* to exclude parol evidence to be offered at trial. We do note, however, that it is well-established under Louisiana law that parol evidence is admissible to show mutual error and mistake in a reformation case. *See, e.g., Daigle & Assocs., Inc. v. Coleman*, 396 So.2d 1270, 1271 (La.1981); *Fontenot v. Lewis*, 215 So.2d 161, 163 (La.App. 3d Cir.1968) (citing cases).

So.2d 649 (1956); *Waller v. Colvin*, 151 La. 765, 92 So. 328 (1922); *Kemp v. Beasley*, 188 So.2d 425 (La.App.3d Cir.1966); *Walker v. Jim Austin Motor Co.*, 162 So.2d 135 (La.App.1st Cir.), *writ denied*, 246 La. 354, 164 So.2d 353 (1964)). The high degree of proof required is consistent with the principle that "[w]hen parties reduce their contracts to writing and the writing exhibits no uncertainty or ambiguity as to the nature, the object, and the extent of the agreement, it is presumed that the writing expresses the true and complete undertaking of the parties." *Campo v. La Nasa*, 173 So.2d 365, 369 (La.App.4th Cir.1964), *writ denied*, 247 La. 874, 175 So.2d 109 (1965); *cf. Southwest Gas Producing Co.*, 230 La. at 353–55, 88 So.2d at 654–55 (presumption of correctness of deed). Therefore, under Louisiana law, OKC must present clear and convincing proof of mutual mistake in order to obtain reformation.

Where, as here, the clear and convincing evidence standard applies, the court's inquiry as to whether a genuine issue exists will be "whether the evidence presented is such that a [factfinder] applying that evidentiary standard could reasonably find for *either* the plaintiff or the defendant," *Liberty Lobby*, 106 S.Ct. at 2514 (emphasis added). Stated differently, the appropriate summary judgment question will be whether the record evidence could support a reasonable finding by the factfinder either that the plaintiff has shown mutual error and mistake by clear and convincing evidence *or* that plaintiff has not. *See id.*

■ After carefully reviewing the evidence in the record before us, including the numerous depositions and the documentary evidence, we conclude that the evidence is not such that a factfinder, applying the clear and convincing standard, could reasonably find for OKC. Looking through the prism of the clear and convincing evidence standard, the focus of our inquiry must be on the process by which the Farmout was reduced to writing and then reviewed by OKC. If that process could not admit of *mutual* error as a matter of fact, reformation will not lie.

■ The ultimate question in a reformation case, and one that is denominated as a fact question, *see, e.g., Agurs v. Holt*, 232 La. at 1032, 95 So.2d at 646, is whether a mutual mistake was made. The critical period for purposes of analysis of that question is the period during which the proposed agreement at issue was reduced to writing and reviewed prior to the signing.[18] In analyzing the ultimate question of whether a mutual mistake was made, the court should focus on who reduced the proposed agreement to writing, who the parties to the agreement were, whether the provision at issue was central to the agreement, and what pains the parties took in reviewing the written instrument.

Since this case is before us on appeal of a grant of partial summary judgment, we view the evidence in the light most favorable to OKC and with all inferences drawn in OKC's favor. For purposes of summary judgment we will assume three things: (1) that OKC and Aminoil reached an "antecedent agreement;" (2) that the parties intended that the agreement would be reduced to writing; and (3) that there is a material variance between the antecedent agreement and the written instrument.[19] *See, e.g., Merritt v. Hays*, 237 La. 557, 567, 111 So.2d 771, 774 (1959); *Campo v. La Nasa*, 173 So.2d at 369. Even assuming, as we do, that OKC could show these three

---

18. *See, e.g., Prentice v. Amax Petroleum Corp.*, 220 So.2d 783, 789 (La.App. 1st Cir.), *writ denied*, 254 La. 455, 223 So.2d 867 (1969); *see also Aetna Ins. Co. v. Paddock*, 301 F.2d 807, 810 (5th Cir.1962) (Texas case) ("The mistake must be in the drafting of the instrument ... and not in making the contract which it evidences."); Diaz, *Reformation of Instruments of Louisiana*, 30 Tul.L.Rev. 486, 488 ("An unintentional correctible error in the written instrument must be common to the mutual understanding of the parties and must occur in reducing the oral bargain to writing and not in the oral bargain itself.") (footnotes omitted).

19. OKC, in its brief to this court, sets forth its account of the negotiations that took place between OKC and Aminoil prior to the time that Aminoil undertook the drafting of the Farmout. We need not dwell on these facts since, for purposes of summary judgment, we accept that there was an "antecedent agreement" and that the written instrument materially varies from it.

factors, our inquiry would not be at an end. Rather, the existence of those three factors simply poses the problem. Remaining for us to ascertain is whether the record evidence would support a reasonable finding by a factfinder that OKC has shown, by clear and convincing evidence, that a *mutual mistake* was made, such that the written instrument does not express the true intent of the parties *at the time the Farmout was signed.* The three factors outlined above are simply probative of that question; they are not dispositive.

Two scenarios can be posited for what might have transpired between OKC and Aminoil. The first is that a mistake was made such that the written instrument varies from the antecedent agreement and fails to reflect the true intent of the parties. The other is that there is a variance between the antecedent agreement and the written instrument, but that the parties agreed to the terms of the written instrument, and thus, that the written instrument accurately reflects their intentions at the time of signing.

The evidence, viewed in the light most favorable to OKC, supports only the second hypothesis. We accept, for purposes of our review, that OKC and Aminoil negotiated and came to an antecedent agreement, describing the reserved interest with reference to Platform A. We also accept that the parties intended that their agreement be reduced to writing and that the written instrument varies from the antecedent agreement in that it refers to a reserved interest in terms of the "subject lease," with no reference to Platform A. The fact of the variance between the antecedent agreement and the written instrument might be enough to raise a genuine issue of material fact, precluding summary judgment, were it not for the existence in the record of evidence regarding the identity of the parties, the review process, and the centrality of the provision to the Farmout. Focusing on those factors, we find no genuine issue of material fact, that is, we find that the evidence is not such that a factfinder, applying the clear and convincing evidence standard, could reasonably find for *either* OKC or Aminoil. The evidence, viewed in the light most favorable to OKC, overwhelmingly supports the conclusion that there was no mutual mistake.

The evidence shows that the parties, both substantial companies with employees experienced in matters of the type covered by the Farmout, could and did look out for themselves. Aminoil presented the proposed Farmout to OKC for OKC's consideration and approval. Over a period of almost five weeks, OKC officials, experienced in oil and gas transactions, reviewed the proposed Farmout. Several of those OKC officials focused their attention on the very provision now at issue—the reserved interest/net profit provision [20]—and gave their approval to that provision. Further, the provision is drafted in clear and simple terms, such that even a reader with no expertise in oil and gas transactions should find it comprehensible.

Paragraph IV of the Farmout provides:

Aminoil shall reserve to itself *from the interest to be assigned under the terms of this agreement,* an overriding royalty interest equal to one-twelfth ($\frac{1}{12}$) of one-fourth ($\frac{1}{4}$) of eight-eighths ($\frac{8}{8}$) of production, until "net profits" are received as the term is defined hereafter, at which time Aminoil's overriding royalty interest shall automatically convert to a net profits interest equal to twenty percent (20%) of one-fourth ($\frac{1}{4}$) of eight-eighths ($\frac{8}{8}$) of production, until recovery from first production *from the subject lease* of four million (4,000,000) gross barrels of oil, condensate and/or gas equivalent based on ten (10) MCF of gas equaling one (1) gross barrel of oil and/or condensate; thereafter Aminoil's net profits interest shall be increased to thirty-three percent (33%) of one-fourth ($\frac{1}{4}$) of eight-eighths ($\frac{8}{8}$).

(emphasis added). Under the terms of Paragraph IV, Aminoil reserved its royalty/net profits interest from the "interest to be assigned," under the Farmout, that being all of Aminoil's twenty-five percent

**20.** *See supra* note 5.

working interest in Block 89. No restrictions are apparent. When net profits were received, Aminoil's royalty interest would convert to "a net profits interest equal to twenty percent (20%) of one-fourth (¼) of eight-eighths (⅞) of production, until recovery from first production *from the subject lease.*" (emphasis added). References to the "subject lease" continue throughout the eight-page Farmout, with, for example, the production to be considered in calculating Aminoil's net profits interest being "minerals produced from the subject lease

for the satisfaction and realization of net profits interest." Further, of great significance in the analysis of this case, is the centrality of the provision at issue to the Farmout. The provision goes to a significant purpose behind the transaction between OKC and Aminoil.[21]

It is inconceivable, particularly in view of the review process employed here and the expertise of those involved in that process,[22] that a "mistake" as clear and significant as the one alleged by OKC could have "slipped by." [23] It cannot simply be pre-

**21.** Evidence submitted by OKC regarding the initial meetings between OKC and Aminoil, showing that Aminoil did not initially raise the reserved interest issue, are not probative of the mistake question. The pertinent intent of the parties is the intent at the time of signing.

**22.** While we find no case directly on point, we have gained insight into the appropriate factors on which to focus in our analysis from the observations of various courts confronted with mistake claims under Louisiana law. *See, e.g., O'Neill v. Sonnier,* 195 So.2d 724, 728 (La.App. 1st Cir.1967) (affirming denial of reformation because defendant failed to carry burden of proof with respect to question of mutuality of mistake; facts of case viewed in light of clear language of the lease and behavior of parties subsequent to execution negate existence of mistake claimed by defendant); *Campo v. La Nasa,* 173 So.2d at 370 ("[I]f there was error in the manner in which the lease was confected, Dr. LaNasa had full and ample opportunity to discover and rectify the same."); *White v. Myane,* 10 La.App. 195, 196, 120 So. 650, 651 (La.App. 2d Cir.1929) (finding that plaintiff failed to make out his mutual mistake case and reasoning that "[t]he character of plaintiff's intelligence ... does not make it probable that he could have erred as he says he did."); *cf. Ingram Corp. v. J. Ray McDermott & Co., Inc.,* 698 F.2d 1295, 1312 (5th Cir.1983) (reversing district court's denial of summary judgment because the issues raised were barred by previously executed releases which were "unmistakably clear" as to the parties' intent; court said that "[i]n this case, we are buttressed in our decision by the omnipresence of high level executives and competent counsel throughout the entire business activities. The settlement of the many controversies between these parties was no fly-by-night transaction. After months of wrangling and negotiating the executives of Ingram and McDermott exchanged letters outlining proposed settlement terms.... This was followed by the formal releases which were drafted by the parties through their skilled and knowledgeable counsel. As the records of this Court reflect, these counsel were not novices at important litigation which must have included experi-

ence in contract drafting. Ingram, with its battery of executives and counsel, was not impotent when pitted against McDermott. It is inconsequential and unavailing for Ingram to now assert, years after negotiation and execution of its release contracts, that it did not intend to release antitrust claims."); *Hope v. Barham,* 28 F.Supp. 561 (W.D.La.1939) (noting in unilateral mistake case that plaintiff reviewed document that was written in clear terms).

Although decided under Arizona law which provides that reformation will lie only if mistake, fraud, or inequitable conduct infected the underlying negotiations, causing the written document to deviate from the parties' true intent, the Ninth Circuit's opinion in *Bosse v. Crowell Collier & MacMillan,* 565 F.2d 602 (9th Cir.1977), is nonetheless instructive. There, the court stated that:

> While questions of fact often may render summary disposition of such claims as fraud and mistake inappropriate [under Arizona law], the uncontroverted facts in this case reveal the absence of these elements. The record clearly shows that plaintiffs and their attorney examined each document at the time it was executed, discussed at length with MacMillan representatives those terms and conditions about which there were differences between the parties, and fully understood what was being signed. The parties dealt at arm's length and were represented by counsel throughout the negotiations, and had full knowledge of all facts surrounding the transaction. These facts warranted the district court's conclusion as a matter of law that mistake, fraud or inequitable conduct, the necessary prerequisites to reformation, were lacking. Under these circumstances, reformation was properly denied.

*Id.* at 610.

**23.** In this regard, we note that the claimed mistake for which reformation is sought in this case distinguishes this case from most reformation cases. The garden variety reformation case would be a case calling for the correction of an incorrect property description in an act of sale. *See, e.g., Agurs v. Holt,* 232 La. 1026, 95 So.2d

sumed that there was merely a mistake in transcribing the agreement when we are admonished to proceed with caution and to require clear and convincing proof of the highest degree. *See Hollingsworth v. Edwards*, 397 So.2d 34, 37 (La.App.2d Cir. 1981); *see also Crowell & Spencer Lumber Co. v. Hawkins*, 189 La. 18, 23, 179 So. 21, 23 (1938) ("In these circumstances we do not see how it can be conclusively stated that the contracting parties intended anything but what was written in the contract.").

Even if one could conclude that OKC was in error at the time it signed the Farmout— that is, that there was sufficient evidence on that issue to send it to a trier of fact— the evidence would not support a finding that the mistake was mutual. The record evidence would not support a finding that, at the time the Farmout was signed, Aminoil believed that the Farmout meant anything other than what the terms of the Farmout provide. Even if Aminoil believed, at one time, that it made a deal different from the one evidenced by the Farmout, there is no evidence that the Farmout, as signed, does not accurately reflect Aminoil's intent at the time of sign-

ing. Indeed, the evidence clearly indicates a deliberate decision on the part of Aminoil, mid-way through the drafting process, to reserve an overriding royalty interest in production from the subject lease as distinguished from an interest in production from Platform A.[24]

Thus, the motion for partial summary judgment was properly granted by the district court because, bearing in mind the clear and convincing burden OKC would bear at trial, the evidence is not such that a factfinder, applying that evidentiary standard, could reasonably find for *either* OKC or Aminoil. *See generally Liberty Lobby*, 106 S.Ct. at 2509–15.

## III.

OKC next takes issue with the district court's decision on trial of the accounting portion of this action, arguing that the district court erred in excluding charges for interest and litigation expenses from the net profits account.

OKC contends that the language of the accounting section of the Farmout clearly and unambiguously provides for the charging of "costs" to the net profits account[25]

---

644 (1957); *Brulatour v. Teche Sugar Co.*, 209 La. 717, 25 So.2d 444 (1946); *Waller v. Colvin*, 151 La. 765, 92 So. 328 (1922); *Cockerham v. Aime*, 110 So.2d 238 (La.App. 1st Cir.1959).

Of course, there are cases in which reformation was granted, upon clear and convincing proof of mistake, where the reformation sought to change the nature of the contract. *Cf. Fontenot v. Lewis*, 215 So.2d 161, 163 (La.App. 3d Cir.1968) (reversing grant of summary judgment in reformation case because genuine issue of material fact existed as to whether there was mutual error and noting that "[t]he trial judge found that 'the attempt at reformation does not by any means address itself to minor irregularities or typographical errors in the original description; rather, the reformation seeks to drastically change the entire nature of the original description.'").

The distinction between correction of "clerical-type" errors and correction of errors that go to the nature of the contract has been noted by Louisiana courts. *See, e.g., Price v. Taylor*, 139 So.2d 230, 236 (La.App. 1st Cir.1962); *Merritt v. Hays*, 237 La. at 557, 111 So.2d at 771.

Some courts, called upon to reform contracts on the basis of errors that go to the nature of the contract, as opposed to mere "clerical" errors, have suggested that the plaintiff has an even greater burden of proof. *See, e.g., Price v.*

*Taylor*, 139 So.2d at 236 ("In the instant case the court is not called upon to reform a deed because of a mere omission of property therefrom or an erroneous description of property included therein but rather to include property which, by the terms of the act sought to be reformed, is expressly and specifically excluded therefrom. For obvious reasons an even greater burden of proof rests upon plaintiff herein under such circumstances.").

**24.** *See supra* note 4.

**25.** Paragraph IV(e)(1) of the Farmout provides that against the net profits account shall be charged:

an amount equal to the *costs* to OKC of all direct labor (excluding fringe benefits), transportation, and other services necessary for exploring, developing, equipping, operating and maintaining the subject lease; and of all material, equipment, and supplies purchased by OKC and used on the subject lease; and of any amounts charged to OKC in connection with the creation of any unit or units in which the subject lease is or may be included; and of that portion of any other amounts paid to any operator.

(emphasis added).

and that interest on expenditures for mineral exploration, development and production come within both the ordinary meaning of the word "cost" [26] and the meaning given the word by accountants. OKC argues that the receipt of expert testimony to arrive at a contrary conclusion was error on the part of the district court. Further, OKC alleges that the Farmout specifically provides for the charging against the net profits account of litigation expenses incurred as a result of the ownership of the lease [27] and that the district court's conclusion that the litigation expenses related to the instant lawsuit are not chargeable, based on expert testimony, constituted error.[28] Finally, OKC argues that, even assuming the expert testimony was admissible to interpret the Farmout, the testimony was inadmissible here because it lacked a proper evidentiary foundation and timely objection to its admission was made.

Over the objection of OKC, the district court accepted the testimony of its own expert and the two expert witnesses produced by Aminoil. The court's own expert, appointed pursuant to Rule 706 of the Federal Rules of Evidence, was Julian P. Brignac. Brignac is an attorney and certified public accountant who retired in 1982 from his position as a partner in the accounting firm of Peat Marwick Mitchell & Company and is now special counsel to a law firm.

Aminoil's experts were Ronald Bannister and William Powell, partners in the accounting firm of Price Waterhouse & Co. Bannister and Powell testified to their extensive accounting experience in general and, in particular, to their oil and gas accounting experience. They were accepted by the court as experts in oil and gas accounting.

Powell and Bannister testified that the net profits accounting provisions in the Farmout at issue in this case, as with similar accounting provisions, are consistently interpreted to exclude interest unless interest is specifically designated as a chargeable item.[29] With regard to OKC's charge against the net profits account for litigation expenses, Powell and Bannister testified that such accounting language, under accepted accounting practices in the oil and gas industry, never includes legal expenses related to a dispute between the contracting parties.[30]

In response to OKC's objection to the expert testimony on the ground that expert accountants should not be allowed to "interpret" the Farmout's accounting provisions, the court noted that the net profits accounting provisions in the Farmout have a specialized usage and meaning within the oil and gas accounting field; expert accounting testimony was required to explain

---

**26.** OKC argues that under the "generally prevailing meaning" of the word "cost," as taken from *Webster's Dictionary,* the interest charge represents a part of the "cost" to OKC of "labor ... transportation, and other services necessary for exploring, developing, equipping, operating and maintaining the ... lease; and of all material, equipment, and supplies purchased by OKC." Original Brief of Defendants-Appellants at 37.

**27.** Paragraph IV(e)(2) of the Farmout provides that against the net profits account shall be charged:

> an amount equal to the expenses of *litigation,* liens, judgments, and liquidated liabilities and claims incurred and paid by OKC on account of its ownership interest in the subject lease, or incident to the development, exploration, operation, or maintenance thereof.
> (emphasis added).

**28.** OKC argues that the plain language of the Farmout provision dealing with litigation expenses allows OKC to charge against the net

profits account the litigation expenses incurred by OKC "on account of its ownership interest in the subject lease" and that the instant lawsuit results from OKC's ownership interest in the lease. OKC argues that there is no technical term or term of art in Paragraph IV(e)(2) for which expert testimony was required, and appears to view the expert testimony on the propriety of the charge for litigation expenses as testimony relating to the subjective intent of the parties.

**29.** Bannister also noted the absence in the Farmout of any method for determining how interest would be calculated or charged.

**30.** OKC does not dispute that the deposition testimony of Brignac, the court-appointed expert, supports the testimony of Powell and Bannister.

the accounting interpretation of those provisions.[31] The court stated:

> These experts are interpreting these net profits accounting provisions, but it is their accounting interpretation based on their training and experience, which they are explaining in aid of this Court's legal determination of the issue of whether OKC has improperly charged such legal expenses and interest. They have not testified violative of the parol evidence rule. Neither Aminoil nor OKC contend that the farmout is ambiguous.

*Aminoil USA, Inc. v. OKC Corp.*, 629 F.Supp. 647, 654 (E.D.La.1986). The court found that Louisiana Civil Code Article 2047 controlled. Article 2047 provides:

> The words of a contract must be given their generally prevailing meaning.
>
> Words of art and technical terms must be given their technical meaning when the contract involves a technical matter.

La.Civ.Code Ann. art. 2047 (superseding arts. 1946 and 1947 of the 1870 Civil Code). Further, the court cited Rule 702 of the General Rules of Evidence as support for the court's rejection of OKC's objections. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Finally, the court noted that "[t]he evidence does not vary or contradict the net profits accounting provisions. It explains them." 647 F.Supp. at 654.

■ We note first that in a diversity case, the Federal Rules of Evidence govern the admissibility of evidence. *Garwood v. International Paper Co.*, 666 F.2d 217, 223 (5th Cir. Unit B 1982). "The admission or exclusion of expert testimony is a matter left to the discretion of the trial judge, and his or her decision will not be disturbed on appeal unless it is manifestly erroneous." *Perkins v. Volkswagen of Am., Inc.*, 596 F.2d 681, 682 (5th Cir.1979) (citing Fed. R.Evid. 702); *see also Vallot v. Central Gulf Lines, Inc.*, 641 F.2d 347, 350 (5th Cir. Unit A April 1981).[32] In this case, the decision of the trial court to admit expert testimony clearly does not require reversal.

In arguing that the district court erred in excluding the charges for interest and litigation expenses from the net profits account on the basis of the expert testimony admitted at trial, OKC correctly cites several general principles of Louisiana law. First, it is clear that courts must give legal effect to contracts according to the true intent of the parties, that intent to be determined by the words of the contract when those words are clear and explicit and lead to no absurd consequences. La.Civ.Code Ann. art. 2046; *see, e.g., Leenerts Farms, Inc. v. Rogers*, 421 So.2d 216, 218 (La.1982).

---

**31.** Calling it misplaced, the court rejected OKC's objection based on the parol evidence rule that the testimony seeks to elicit extrinsic evidence with respect to an unambiguous contract. The court noted a section from OKC's submission to the court's expert wherein OKC stated:

> It is defendant's position, therefore, that the court-appointed expert witness should review and analyze the May 9 letter in light of generally accepted accounting and auditing principals [sic] in the oil and gas industry to prepare himself to present his expert opinion regarding the propriety of the categories of charges enumerated above and the proper account of said charges at the hearing before the Court on the accounting issues.

Defendant's Statement of the Case and Definition of Issues.

**32.** Other Fifth Circuit cases have phrased the standard of review of the district court's admis-

sion or exclusion of expert testimony under Fed.R.Evid. 702 as one of "abuse of discretion." *See, e.g., Garwood,* 666 F.2d at 223. We construe these various statements of the standard of review to be harmonious. As several Fifth Circuit cases (decided before Rule 702 was enacted) observed, "[o]nly if we determine that [the district court's] decision is 'manifestly erroneous' may we find that [the district court] abused [its] discretion." *Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 535 (5th Cir.1974); *see also Keystone Plastics, Inc. v. C & P Plastics, Inc.*, 506 F.2d 960, 964 (5th Cir.1975). In this regard we also note that the panel in *Garwood*, in support of its statement that the district court's admission or exclusion of expert testimony is reversible only for abuse of discretion, cited *Vallot* and *Perkins*, both employing the "manifestly erroneous" phraseology.

Further, under Louisiana law, contractual provisions are to be given their "generally prevailing meaning." La.Civ.Code Ann. art. 2047; *see, e.g., Fishbein v. Bankston,* 426 So.2d 649, 651 (La.App.1st Cir.1982).[33] However, OKC fails to give weight to the very provision of the Louisiana Civil Code that the district court cited in support of its decision to reject OKC's objection to the admission of expert testimony. Article 2047, after providing that words of a contract must be given their generally prevailing meaning, recognizes that "[w]ords of art and technical terms must be given their technical meaning when the contract involves a technical matter." [34] La.Civ.Code Ann. art. 2047; *see, e.g., Van Geffen v. Herbert,* 439 So.2d 1257, 1259 (La.App.5th Cir.1983) (stating that article 1947 of the Civil Code, whose substance is reproduced in article 2047, provides that terms of art or technical phrases must be interpreted according to received meaning in the profession or art in question).[35]

Consistent with article 2047, and with Fed.R.Evid. 702, the district court admitted the testimony of Bannister, Powell and Brignac. We believe that the district court's admission of this expert testimony was not manifestly erroneous. Indeed, in this case, the admission of the expert testimony of the individuals experienced in the oil and gas accounting field for the purpose of obtaining explanation of the technical meaning of terms used in the net profits accounting provisions of the Farmout seems prudent.[36] *See, e.g., Gorenflo v. Texaco, Inc.,* 735 F.2d 835, 838 (5th Cir. 1984) (noting in Louisiana diversity case that "[a]rticles 1946 and 1947 of the [1870] Louisiana Civil Code direct interpretation of the words 'develop and operate' [in oil, gas and mineral lease] consistent with their received meaning within the oil and gas

**33.** We also acknowledge the principle that contract provisions must be interpreted in light of the other contract provisions so that each provision is given the meaning suggested by the contract as a whole. La.Civ.Code Ann. art. 2050. We do, however, find OKC's argument that its interpretation of the word "costs" was consistent with the object of the Farmout to be without force here.

**34.** We believe that this Civil Code section adequately addresses OKC's contention that had the parties wished to incorporate accounting definitions into their agreement, they could and would have done so, and therefore, that the admission of expert testimony was improper.

We note that OKC seems implicitly to have recognized that the technical meaning of the Farmout term "cost" is relevant. In its brief to this court, OKC argues that its interpretation of "cost" is supported by the meaning of the word as used and understood in the accounting profession, citing Statement No. 34, issued by the Financial Accounting Standards Board ("FASB"). In OKC's view, the FASB Statement, introduced by OKC on cross-examination of Aminoil's expert witnesses, establishes that the interest charges claimed by OKC are part of the "cost" of development of the lease referred to in Paragraph IV(e)(1) of the Farmout.

**35.** We note that the district court, in its opinion, cited Paragraph IV(c) of the Farmout which provides that "OKC shall maintain a net profits account in accordance with the terms of this agreement and good accounting practices." Aminoil attaches great significance to this provision, using it to support the admission of the

expert testimony in this case. Aminoil describes the expert testimony provided by Bannister and Powell as "regarding the accounting interpretation of the net profits provisions of the Farmout *necessary to maintain a proper net profits account.*" Original Brief of Plaintiff-Appellee at 39 (emphasis in original). We find it questionable whether Paragraph IV(c), providing that the net profits account is to be kept in accordance with good accounting practices, relates in any way to a determination of which charges against net profits are allowable and whether it provides any support for the admission of expert testimony in this case. However, since we believe that a fair reading of the district court's opinion belies reliance by the court on Paragraph IV(c) in its decision to admit the testimony and instead, shows a justifiable reliance on Fed.R.Evid. 702 and La.Code Ann. art. 2047, we affirm the district court's decision without resolving the issue.

Further, OKC makes the argument that even assuming that expert testimony was admissible to interpret the Farmout, the testimony was inadmissible here because it lacked a proper evidentiary foundation. For the reasons set forth above, particularly that the testimony was properly admitted under article 2047 as explanatory of the technical meaning of the terms, we find this argument to be meritless.

**36.** Our conclusion applies with equal force to the admission of expert testimony with respect to both the interest and litigation expense charges. The testimony offered by the experts served the same purpose, *see* La.Civ.Code Ann. art. 2047, with respect to both issues.

industry."); *Van Geffen v. Herbert,* 439 So.2d 1257 (La.App. 5th Cir.1983) (applying principle of 1870 Civil Code article 1947 "that terms of art or technical phrases appearing in contracts are to be interpreted according to their received meaning in the profession or art in question" and concluding that lease term "practice of general dentistry" does not include specialized practice of orthodontics; court relied on testimony of several expert dental witnesses); *cf. Agnelly v. Lauricella,* 383 So.2d 813 (La.App. 4th Cir.1980) (finding testimony of certified public accountant served to assist court in interpretation of accounting terms, citing 1870 Civil Code article 1947). Under the substantive law of Louisiana, the technical meaning of the technical terms used in the Farmout was relevant. To maintain, as OKC does, that contract terms for which one can find a dictionary definition must be interpreted as per that dictionary definition is to ignore article 2047's dictate that technical terms be given their technical meaning when the contract involves a technical matter. What better way is there to discover the technical meaning than through the use of Federal Rule of Evidence 702.

■ In conclusion, we note that the district court's finding that the charges for interest and litigation expenses claimed by OKC are prohibited was not erroneous.

### IV.

For the reasons set forth above, the judgment of the district court is AFFIRMED.