**ILLINOIS CENTRAL GULF RAILROAD COMPANY, Plaintiff–Appellee,**

v.

**R.R. LAND, INC. and Richard S. Blossman Family Revocable Trust, Defendants–Appellants.**

**R.R. LAND, INC. and Ruhl, Inc., Plaintiffs–Appellants,**

v.

**ILLINOIS CENTRAL RAILROAD COMPANY, Defendant–Appellee.**

No. 92–3119.

United States Court of Appeals, Fifth Circuit.

April 12, 1993.

---

Robert E. Arceneaux, Mark E. Barham, Anita M. Warner, Barham & Markle, New Orleans, LA, for defendants-appellants.

Patrice W. Oppenheim, Frank A. Diccolo, Lawrence Emerson Abbott, Abbott, Best & Meeks, New Orleans, LA, for plaintiff-appellee.

Before WILLIAMS, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

The pivotal issue before us concerns the district court's grant of reformation in favor of Illinois Central Gulf Railroad Company (IC). Because we conclude that the contractual negligence defense does not bar reformation where mutual mistake has been pleaded and proved, and that the district court did not clearly err in finding both clear proof of an antecedent agreement and clear and convincing evidence of mutual mistake in reducing that agreement to writing, we AFFIRM the grant of reformation. We also AFFIRM the district court's rejection of claims for damages by R.R. Land, Inc. (Land), and Ruhl, Inc.

I.

In 1983, T. Eugene Timm, real estate sales representative for IC, and Richard S. Blossman, president of Ruhl and agent for

Land[1], entered negotiations for the sale of IC's Shore Line Branch property, a 200–foot wide tract to the north of Lake Pontchartrain, running approximately 31 miles from Slidell to Covington, Louisiana. The railroad operated on the 50–foot center strip of the property.

During negotiations, IC discussed its obligations, under federal and state grants, to continue operation of the railroad line.[2] IC stated that it intended to abandon the line, but could not attempt to do so until its commitment expired in 1986. It further explained that abandonment of the line required Interstate Commerce Commission approval, pursuant to 49 U.S.C. § 10905, and that IC could not guarantee that the ICC would grant it.[3]

■■■ In part because of the above limitations, IC and Blossman arranged for the acquisition of the tract through four separate sales. The following procedures governed. For each sale, IC prepared a Real Estate Sale Contract (Contract)[4], which was then executed by the purchaser (either Ruhl or Land). The purchaser retained a yellow copy of the Contract and made an offer to IC by returning the original and remaining copies to IC. Before accepting the offer, IC submitted the Contract to multiple departments within IC for approval. If accepted, the Vice President of the Real Estate Department, then R.A. Irvine, executed the Contract. IC retained a copy coded in green and an original for its files. The buyer also retained an original. An Act of Cash Sale (ACS) followed.[5]

The first three sales (first two to Ruhl, third to Land) took place between July 1984 and January 1985, and conveyed the land on each side of the 50–foot center strip of trackage. These sales followed the above described procedure and are not in dispute.[6] As discussed in note 6, *supra*, with

1. Ruhl is wholly owned by Blossman; Land, by his children and in-laws.

2. William C. Douglas, who, at the time of the sales, held the position of area manager for real estate, testified that he explained to Blossman the difficulty of selling the ground underlying the tracks so long as the railroad remained obligated to continue operation of the line— "What we were attempting to do is something that had not been done before and we wanted to point out to Mr. Blossman that this property would have to have an easement on it for as long as the railroad operated its trains and as long as there was service there and until such time as the Interstate Commerce Commission would allow an abandonment".

3. Douglas testified: "I let him know that we were in the process of looking at abandonments and we had been abandoning a lot of lines throughout the system, but since there are shippers on these lines who have a lot of concerns about where they're going to get their transportation needs met, they sometimes object and the Interstate Commerce Commission does not always grant abandonment".

4. A contract of sale is perfected when the parties reach an agreement as to price and object. LSA–C.C. art. 2456. Generally, where the parties to a sale of land have agreed in writing upon the price and terms and description of the land sold, it is a sale, providing either party with the right to specific performance, not merely an "agreement" or "promise" to sell. LSA–C.C. art. 2462. But, where, as here, the execution of a later final act of sale is contemplated by the parties, an agreement to sell is not a completed

sale. *Webb v. Young,* 338 So.2d 767, 769 (La. App. 4th Cir.1976); *see also Noto v. Blasco,* 198 So. 429, 432 (La.App. 1st Cir.1940) ("an agreement for the sale of real estate, which contemplates the passing of the property not immediately and by virtue of the agreement, but by an act to be executed at a later date ... is merely a promise of sale....")

5. Under LSA–C.C. art. 1833, an "authentic act" is "a writing executed before a notary public or other officer authorized to perform that function, in the presence of two witnesses". All sales of immovable property "shall be made by authentic act or under private signature". LSA–C.C. art. 2440. An authentic act of cash sale establishes transfer of title; *Blanchard v. Naquin,* 476 So.2d 520, 523 (La.App. 1st Cir.1985); it is equivalent to a deed. *See Hollier v. Galtier,* 430 So.2d 376, 377 (La.App. 3d Cir.1983) (referring to act of cash sale as a deed).

6. The first sale conveyed two 75–foot wide tracts (each side of the middle 50 feet), located in Lacombe, Louisiana, to Ruhl. The terms and conditions in the Contract executed by Ruhl on July 13, 1984, and by IC on October 1, 1984, coincide with those in the ACS, executed on October 26, 1984.

The second sale conveyed two 75–foot wide tracts in Mandeville, Louisiana, to Ruhl. Again, the terms and conditions in the Contract, executed by Ruhl on October 25, 1984, and by IC on December 14, 1984, coincide with the ACS, executed on December 18, 1984.

The third sale conveyed to Land the remaining 75 feet on each side of the middle 50–foot

slight exception, the terms and conditions in each Contract coincide with its corresponding ACS. The fourth sale, transferring the remaining portion (middle 50 feet) of the 31 mile long tract to Land, is the subject of IC's reformation action. At trial, in connection with that fourth sale, the parties introduced four Contracts.

Blossman executed the first two Contracts on April 23, 1985[7]; IC rejected both. On August 2, 1985, Blossom executed a third Contract, reflecting—as did the first two—a purchase price of $160,000 and a deposit of $32,000. Preprinted paragraph three specifically excludes the seller's tracks, appurtenances, buildings or other improvements from the sale.[8] The third Contract (for the final/fourth sale) incorporates all of the provisions contained in Rider A, which—similar to Rider A for the Contract for the third sale, see note 6, *supra*—reserves the trackage and an easement[9] in IC's favor until the tracks are

abandoned or removed, and prohibits the buyer from interfering with IC's easement.[10] Rider A also provides notice that, should IC seek an abandonment order from the appropriate regulatory body, a third party or rail carrier may have the right to acquire the track and continue railroad operations.[11] In addition, Rider A contains an atypical provision requiring IC to pay five percent of the purchase price as a real estate commission. The final provision of the third Contract is an omnibus description of the property, included to assure that the four sales conveyed all of the Shore Line Branch property without gaps.

In addition, on August 19, 1985, IC requested by letter that the Contract be amended to extend IC's time for removal of the tracks from one year to 18 months. Blossman signed the letter; and, on September 3, 1985, Irvine executed the third Contract for IC.

---

**6.** strip over which the railroad line operated. On January 24, 1985, IC accepted Land's offer of November 14, 1984, subject to conditions documented in Rider "A", which includes several covenants and a reservation of its trackage and easement in its favor. Land conditioned acceptance on the alteration of language concerning its obligation to maintain sight zones; accordingly, the parties modified sight zone language in the ACS. *See infra.* Otherwise, the terms and conditions in the Contract coincide with those in the ACS dated January 30, 1985.

**7.** Each reflects a purchase price of $160,000 and a deposit of $32,000, a reservation of trackage, and an easement in favor of IC, providing that IC's rights would cease no later than one year from abandonment. The only difference between the two contracts is that one requires IC to pay a real estate commission.

**8.** The parties used language from preprinted paragraph three, but excluded the latter portion of the provision (lined through below). Preprinted paragraph three provides that

> seller's tracks and appurtenances thereto, buildings or other improvements are not included ~~and may be removed by seller within 90 days (weather permitting) after written demand by buyer following delivery of deed. If not so removed within said period they shall be considered abandoned by seller and become property of the buyer in place.~~

**9.** We recognize that "easement" is not a civilian term; but, like the district court, we use it to remain consistent with the documents.

**10.** Rider A provides, in part:

> Seller reserves for itself, its successors and assigns its trackage and an easement for its right-of-way as now located on the subject premises ... with the right to use, operate over and replace or remove said railroad tracks and appurtenances thereto, together with all reasonable right of access across the premises.... *The easement reserved herein by Seller shall be for the exclusive use of the property reserved and Buyer shall have no right to enter upon or use said property until the tracks have been abandoned and removed by Seller, its successors or assigns.* This reservation shall continue until the completion of removal of said railroad facilities, but in no case greater than one year from date of a final and effective abandonment order....

**11.** Rider A provides in further part:

> [T]here may be conditions or stipulations as a condition to said abandonment, including but not limited to the right of a third party or rail carrier to acquire the track and interest of Seller in order to continue railroad operations over said track pursuant to 49 USC 10905 or for public use under 49 USC 10906. Buyer acknowledges that any abandonment by Seller may contain such conditions.... Further, buyer acknowledges the fact that Seller might be required to sell the railroad line for continued railroad operations pursuant to 49 USC 10910. In view of the foregoing, Seller does not know when it can deliver possession and does not represent that it will ever be able to deliver possession of the land to be conveyed.

IC contends that this third Contract and amending letter evidence the mutual intent of the parties. Blossom counters that the parties modified their agreement, both orally and in writing. According to Blossman, IC agreed to seek approval to abandon its operations immediately after its commitment to the federal government expired in 1986, agreed to lease the property from Land for operating the railroad until abandonment, and agreed to transfer the trackage to Land. Blossman testified that the fourth Contract for this final/fourth sale, which deleted any reference to Rider A, was executed by his son, as President of Land, on September 1, 1985, and purportedly executed by Irvine ten days later on September 11.[12]

Joyce Lucas, a notary public employed by IC, prepared the ACS for the fourth sale; and Irvine executed it for IC on September 18, 1985. The ACS conveys to Land "[a]ll that portion of the remaining right-of-way and property of Illinois Central Gulf Railroad Company's Shore Line Branch...." It does not include any of the reservations contained in Rider A, nor does it obligate IC to all of the affirmative commitments Blossman contends IC agreed to following execution of the third Contract.

According to Lucas, approximately three months later, she reread the ACS and discovered that she failed to include the two page Rider A reserving the tracks, ties, and an easement. Blossman refused, however, to change the ACS. Therefore, in January 1986, IC filed suit in federal court to reform the ACS; but in mid–1987, the case was removed from the active docket while the parties attempted to settle.[13] Five years later, Land and Ruhl sued IC in state court, claiming breach of contract and detrimental reliance, arising from IC's alleged failure to apply for abandonment; unjust enrichment and trespass, arising from IC's use of the property; slander of title, caused by an alleged illegal notice of *lis pendens* filed in bad faith by IC; and reimbursement for maintenance costs, including expenses incurred in maintaining sight zones. IC removed the action to federal court; the two cases were consolidated; and a two day bench trial was held in December 1991.

In most detailed, comprehensive, and insightful findings of fact and conclusions of law, the district court carefully reviewed the evidence and held that the ACS did not reflect the mutual intent of the parties. It found Blossman's version of the agreement, as reflected in the fourth Contract, implausible, and therefore ordered the ACS reformed to comply with the third Contract. And, it dismissed all claims against IC.

## II.

Land and Ruhl contest the district court's grant of reformation, its denial of damages for IC's alleged failure to diligently apply for abandonment, and its denial of reimbursement for maintenance of sight zones.[14] Going for broke, in the hope that they can keep the clearly erroneous standard of review out of play, they boldly and confidently state in their Reply Brief that they are "not asking this Court to review or overturn a single factual finding made by the district court." But, as discussed *infra*, that standard of review is central to this case.

## A.

Land contends that the district court erred in reforming the ACS to reflect the third Contract. We apply Louisiana

---

12. But, Blossman also testified that the fourth Contract did not totally govern the fourth sale ACS—"we made changes all the way up to the end".

13. The reformation action was set for trial in June 1987, but that May, on the parties' joint request, it was removed from the active docket while they pursued settlement. It was not reopened until June 1991.

14. Land and Ruhl do not contest the district court's disposition of their claims against IC for breach of an oral lease and unjust enrichment. And, because we conclude *infra* that the district court did not err in granting reformation, we affirm the court's disposition of appellants' claims against IC for trespass and slander of title.

law in this diversity action, and cannot give deference to the district court's interpretation of it. *Salve Regina College v. Russell*, ── U.S. ──, ──, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). Under Louisiana law, a party may reform a written instrument that does not reflect the true intent of the contracting parties. *Valhi Inc. v. Zapata Corp.*, 365 So.2d 867, 870 (La.App. 4th Cir.1978). Reformation is an equitable remedy designed to correct an error in the contract. *Id.* The error "must be mutual", *see, e.g., Pat S. Todd Oil Co. v. Wall*, 581 So.2d 333, 336 (La.App. 3d Cir.), *writ denied*, 585 So.2d 569 (La.1991); and it must be "in the drafting of the instrument ... and not in making the contract which it evidences". *Phillips Oil Co. v. O.K.C. Corp.*, 812 F.2d 265, 275 (5th Cir.) (internal quotation omitted), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987).

■ Before an instrument will be reformed, "there must be clear proof of the antecedent agreement as well as an error in committing it to writing". *Pat S. Todd Oil Co.*, 581 So.2d at 336. The party seeking reformation must prove mutual error by "clear and convincing evidence", and parol evidence is admissible to show "that the writing does not express the true intent or agreement of the parties". *First State Bank & Trust Co. v. Seven Gables Inc.*, 501 So.2d 280, 285 (La.App. 1st Cir.1986), *writ denied*, 502 So.2d 103 (La.1987). We freely review conclusions of law; but, because the reformation issue turns on a determination of the parties' intent, we review for clear error. *National Union Fire Ins. Co. v. Circle, Inc.*, 915 F.2d 986, 989 (5th Cir.1990); *see also Phillips Oil*, 812 F.2d at 275 (stating that the determination of mutual mistake is a fact question).

Land relies on three separate bases to challenge the reformation: (1) the district court erred in concluding that the third Contract reflects the final agreement of the parties; (2) the court improperly evaluated the parties' intentions at the time they

signed the ACS; and (3) IC's alleged negligence precludes reformation.

1.

■ The district court found that the third Contract for the fourth sale represents the antecedent and final agreement between the parties. In so doing, it rejected Blossman's testimony regarding subsequent modifications; it also rejected Blossman's characterization of the third Contract as a non-binding "negotiating tool". We conclude that these findings are amply supported by the evidence; in sum, there is no clear error. Moreover, as noted, appellants state that they are not contesting any findings of fact.

Evidence of IC's review process and prior negotiations between the parties provide adequate support for the district court's characterization of the Contract. With respect to the preceding three sales, all substantial negotiations occurred prior to final execution of the Contract, as evidenced by the fact that in the first three sales, the Contracts, for the most part, mirrored their respective ACS's. *See supra* note 6.

In addition, given the difficulty of the transaction and the expressed concern about the inclusion of a reservation of rights until abandonment, it is reasonable to conclude that subsequent material modifications, especially those involving IC's legal obligations under ICC jurisdiction, would require the initiation of a new Contract, or, at least, would be subject to a formal review process.[15] Although Land maintains that the parties modified the third Contract both orally and in writing, there is substantial evidence to support the district court's rejection of Blossman's testimony and the fourth Contract.

First, evidence supports the district court's determination that IC did not agree to enter into a lease. According to Blossman, IC employees Timm and Bob Wiley negotiated a lease whereby IC would pay Land $10,000 per month if IC did not abandon the property upon expiration of its grant. However, testimony at trial estab-

---

**15.** Timm testified that the deletion of Rider A would have required a new proposal and a new

submission for approval to various departments.

lished that Wiley was no longer employed by IC during the alleged negotiations. Moreover, Blossman testified that he knew that Timm and Wiley lacked authority to bind IC.[16] We also note in passing that, given IC's uncertainty regarding the attainment of abandonment, it is most difficult to believe that IC would agree to such a lease.

In addition, there are significant substantive and procedural inconsistencies throughout the fourth Contract that serve to discredit Blossman's testimony. The fourth Contract includes trackage in the sale; however, the parties did not increase the purchase price to reflect the value of the tracks, estimated to be between $175,000 and $300,000. We agree with the district court that, "[i]t is inconceivable that the parties agreed to include trackage of such significant value without in turn increasing the purchase price, particularly where the trackage value alone exceeds the price agreed to for the purchase of the land alone." [17]

Moreover, procedural inconsistencies appear throughout the fourth Contract: (1) a typewritten provision conveying all leases and licenses to the buyer (IC had already assigned all of its rights in the leases to Land); (2) execution by Blossman's son (Blossman signed all previous documents); (3) the yellow copy signed by Irvine (for all other sales, the yellow copy contains only Blossman's signature, which is consistent with the earlier described IC procedures); (4) the initials "BW" and "RSB" next to each modification of the standard terms (Bob Wiley ("BW") drafted the first three ACS's, but terminated his employment with IC prior to the alleged execution of the fourth Contract); (5) an execution date of September 1, 1985 (IC did not even accept or execute the *third Contract* until September 3, 1985); (6) IC's alleged acceptance of the offer in ten days (in prior sales, it took IC one month or more to accept Bloss-

man's offer); and (7) Land's failure to produce a pink or white original (it was standard procedure for IC to send the buyer an original upon final execution).

Based on our review of the record, and as reflected in part by the inconsistencies of the fourth Contract and the questions surrounding the formation of an oral lease, the district court did not clearly err in rejecting Land's version of the agreement and, thus, reaching the conclusion that the third Contract represents the final agreement of the parties.

### 2.

■ Even assuming the parties did not agree to modify the third Contract, Land asserts that the reformation order was improper. According to Land, the evidence reflects, at most, a unilateral mistake, as the ACS (deed) correctly reflected Blossman's stated desire to purchase the tracks and the land. Land contends that the district court erred by failing to make a factual finding regarding Land's intention at the time it executed the ACS. Additionally, Land maintains that our decision in *Phillips Oil* precludes a finding of mistake on the part of IC.

First, we disagree with Land's interpretation of the district court's findings of fact and conclusions of law. Although the district court did not make an express finding regarding Land's intent on execution of the ACS, it concluded that Blossman's version of the agreement was "implausible", and went into great detail in support of that conclusion. The court also explained the bases for its reliance on the third Contract. Accordingly, we can easily infer that the court implicitly found that, at the time of signing the ACS, Land intended the ACS to include Rider A (as reflected in the third Contract).

We recognize, of course, that Land vehemently asserts that it intended for the ACS

---

**16.** Wiley denied knowledge of a lease agreement, and Timm denied telling Blossman that IC would lease the property.

**17.** There are two additional substantive inconsistencies worth noting. First, the fourth Contract reflects a deposit of $16,000, which is in-

consistent with the $32,000 deposit reflected in prior Contracts, and the fact that a $32,000 deposit was made. And, second, the fourth Contract deletes payment of a broker's commission; yet a broker's commission was paid in accordance with Rider A of the third Contract.

to exclude Rider A; however, at the same time, we are most cognizant of "the paradoxical truism that every defendant in a case alleging mutual error denies the error; otherwise he would have consented to an extrajudicial act of correction and there would have been no lawsuit". *Collins v. Whittington*, 322 So.2d 847, 850 (La.App. 4th Cir.) (internal quotation omitted), *writ denied*, 323 So.2d 480 (La.1975). As is often the case when resolving reformation disputes based on alleged mutual error, the trial court is left with a credibility determination.[18] The district court considered two days of testimony and resolved this issue against Land. Given the evidence in the record that calls Blossman's credibility into question, we do not find clear error.

We also hold that the district court did not err in concluding that IC did not intend to execute the ACS as written for the fourth sale. We agree with it that our decision in *Phillips Oil* is distinguishable. There, officials experienced in oil and gas transactions reviewed the proposed agreement over a period of almost five weeks, focusing their attention and giving their approval to the very provision at issue. 812 F.2d at 276. References to the disputed language, which was central to the agreement, continued throughout the eight-page document. *Id.* at 277. In the light of this evidence, this court refused to find that a mistake had been made, stating that it was "inconceivable, particularly in view of the review process employed here and the expertise of those involved in that process, that a 'mistake' as clear and significant as the one alleged by OKC could have 'slipped by'". *Id.* at 277.

IC's review of the ACS was significantly less thorough. As the district court noted, IC reviews purchase agreements (Real Estate Sale Contracts) with great detail, whereas the ACS receives a far more cur-

sory review. Lucas, the in-house notary who prepared the ACS, is not an attorney, and according to testimony, received little training. Lucas initialed the form approved signature line and the document approved line on the assumption that she had incorporated the terms contained in the third Contract approved by the legal department and by the engineering department. Robert Fowler, manager of the law department, who was actively involved in the approval of the third Contract, did not prepare or review the ACS prior to execution. Although the document was also signed by Irvine, W.H. Sanders (assistant secretary), and two witnesses (Schilling and Arthur Spiros), Lucas, the notary who obtained the signatures, testified that Irvine did not read the ACS before signing it, and, likewise, Irvine and Schilling testified that they did not recall reading it before signing.

In addition, we, like the district court, place significance on the fact that the error here is simply an omission of terms, rather than choice of language that repeatedly appears throughout the document. In preparing the ACS, Lucas followed the usual property description language, yet failed to add the special terms contained in Rider A. Based on these facts, it was not clear error for the district court to conclude that IC did not intend to execute the ACS as written.

In sum, we are not left with a "definite and firm conviction" that the district court erred in concluding that there was clear and convincing evidence of an antecedent agreement (third Contract) and mistake in reducing that agreement to writing (ACS). The parties agreed to the terms of the third Contract; and there is strong evidence indicating both that they did not reach a subsequent agreement, and that neither Bloss-

---

18. *Compare Succession of Jones v. Jones*, 486 So.2d 1124, 1128 (La.App.2d Cir.) (upholding trial court's finding of mutual error based on determination that buyer's key witness lacked credibility), *writ denied*, 489 So.2d 249 (La.1986) with *Collins*, 322 So.2d at 852 (denying reformation based on credibility of defendant's testimony that he intended to purchase all of the disputed property). Additionally, there is evidence

in the record indicating that Land was not aware of the omission of Rider A prior to signing the document. Gerald E. Schilling, manager of title and closing for IC, testified that subsequent to the execution of the ACS, Blossman prodded IC to remove the rails, bridges, and ties in a shorter time frame that what had been specified in Rider A.

man nor IC intended to execute the ACS as written. Accordingly, the district court did not clearly err in finding mutual mistake. *See Lynal, Inc. v. Patrick Petroleum Co.,* 593 F.Supp. 1325, 1327 (W.D.La.1984) (holding that evidence that parties originally intended to delete provision, that they never negotiated a change from that position, and that the provision did not appear in table of contents, is clear and convincing evidence that the inclusion of the provision does not reflect the true intent of the parties).

### 3.

■ Finally, Land contends that Louisiana law precludes reformation where there was negligence on the part of the party claiming mutual error, and that, accordingly, even if the district court did not err in finding mutual mistake, it erred by not imposing IC's alleged negligence as a bar to reformation.[19] We reject this contention, because we conclude that the contractual negligence defense (bar) does not apply to reformation actions where mutual mistake has been pleaded and proved.

The contractual negligence defense is grounded in rescission actions based on unilateral error. Louisiana civil law allows unilateral error to vitiate consent "when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party". LSA–C.C. art. 1949. But, on the other hand, the contractual negligence defense provides that "unilateral error does not vitiate consent if the cause of the error was the complaining party's inexcusable neglect in discovering the error". *Woods v. Morgan City Lions*

*Club,* 588 So.2d 1196, 1201 (La.App. 1st Cir.1991).[20] Most often, this defense bars rescission for error resulting from a party's failure to read the document in issue. *See, e.g., First Financial Bank, FSB v. Austin,* 514 So.2d 281 (La.App. 5th Cir.), *writ denied,* 515 So.2d 1112 (La.1987).

The contractual negligence defense has largely been developed by the courts, and is only tangentially incorporated into the comments to the Louisiana Civil Code. The commentary to article 1952 provides: "In determining whether to grant rescission or, when rescission is granted, whether to allow any recovery to the party not in error, the court may consider whether the error is excusable or inexcusable, a distinction received by modern civilian doctrine." LSA–C.C. art. 1952 (comment d). As an example of an "inexcusable" error, the drafters cite *Watson v. Planters Bank of Tennessee,* 22 La.Ann. 14 (1870), in which the court applied the contractual negligence bar to a party who had signed a written contract without either reading it or knowing its contents.

Despite the entrenchment of the contractual negligence defense in actions for rescission based on unilateral error, there is no indication that the defense also applies to reformation actions based on mutual error. The above-cited code commentary refers only to rescission. Similarly, we have not found Louisiana case law that applies contractual negligence as a bar to reformation where mutual mistake has been pleaded and proved. Land cites many cases that refer to contractual negligence, including cases involving reformation that refer to the defense in *dicta,* but none stand for

---

**19.** Land asserts that "[t]he district court admitted ICGR's negligence in its opinion". We disagree. The court simply contrasted the elaborate review process at issue in *Phillips Oil* with IC's cursory review of the ACS to support its conclusion that IC did not intend to execute the ACS as written.

**20.** As stated by the Louisiana Supreme Court, there are "two prominent factors in the evolution of the contractual negligence defense":
(a) Solemn agreements between contracting parties should not be upset when the error at

issue is unilateral, easily detectable, and could have been rectified by a minimal amount of care.
(b) Louisiana courts appear reluctant to vitiate agreements when the complaining party is, either through education or experience, in a position which renders his claim of error particularly difficult to rationalize, accept, or condone.
*Scott v. Bank of Coushatta,* 512 So.2d 356, 362 (La.1987).

this proposition.[21] By contrast, in *Myers v. College Manor*, 587 So.2d 820 (La.App. 3d Cir.1991), the court refused to apply the defense to preclude reformation for mutual mistake.[22]

Without clear direction from the Louisiana legislature or courts, we refrain from applying the defense to cases where, as here, mutual mistake has been pleaded and proved. As the district court noted, to do so would be inconsistent with the creation of a remedy for documents signed in error. *See* RESTATEMENT (SECOND) OF CONTRACTS § 157 (comment b) (stating that "a party's negligence in failing to read the writing does not preclude reformation if the writing does not correctly express the prior agreement"). Because the district court properly concluded that IC proved mutual mistake, the contractual negligence defense is inapplicable. Therefore, we uphold the grant of reformation.[23]

### B.

Land contends next that the district court erred in refusing to award damages for IC's failure to diligently pursue abandonment. In negotiating the sale of the Shore Line Branch, IC and Blossman contemplated that IC would attempt to abandon the property. IC representatives understood that abandonment was necessary for Land and Ruhl to obtain full benefit from their purchase.[24] At the same time, Blossman understood that abandonment required ICC approval, which could not be guaranteed. He was advised of the possibility that a third party might be asked to take over the line, and that the railroad might have a servitude in perpetuity. On

21. *See Hope v. Barham*, 28 F.Supp. 561, 562 (W.D.La.1939) (stating that plaintiff who allegedly signed documents without reading contents and thus was ignorant of provisions inserted by defendant cannot seek reformation; this case involved unilateral mistake and fraud, not mutual mistake); *Scott v. Bank of Coushatta*, 512 So.2d 356 (La.1987) (applying contractual negligence bar to request for rescission based on unilateral error); *Tweedel v. Brasseaux*, 433 So.2d 133, 138 (La.1983) (holding that plaintiffs failed to show mutual error, fraud, or misrepresentation); *Ker v. Evershed*, 41 La.Ann. 15, 6 So. 566, 567 (1889) (refusing to reform based on insufficient evidence of antecedent agreement); *Cheek v. Uptown Square Wine Merchants W.F., Inc.*, 538 So.2d 663, 665 (La.App. 4th Cir.1989) (mutual mistake not proved); *First National Bank v. Campo*, 537 So.2d 268, 271 (La.App. 4th Cir.1988) (rejecting appellant's allegation of "lack of consent due to misrepresentations" based on his failure to read the document; mutual mistake not at issue), *writ denied*, 538 So.2d 578 (La.1989); *First Financial Bank, FSB v. Austin*, 514 So.2d 281 (La.App. 5th Cir.1987) (holding that appellant is liable on guaranty because he failed to prove a misrepresentation vitiated consent; court refers to contractual negligence to bolster its conclusion; appellant did not plead mutual mistake), *writ denied*, 515 So.2d 1112 (La.1987); *Brabham v. Harper*, 485 So.2d 231, 234 (La.App. 3d Cir.1986) (holding that reformation is improper because appellant failed to prove mutual error); *Campo v. La Nasa*, 173 So.2d 365, 370 (La.App. 4th Cir.1964) (failed to prove mutual error), *writ denied*, 247 La. 874, 175 So.2d 109 (La.1965); *Price v. Taylor*, 139 So.2d 230, 235 (La.App. 1st Cir.1962) (concluding that plaintiff failed to prove mutual error and mistake by clear and convincing evidence); *Bennett v. Robinson*, 25 So.2d 641, 644 (La.App.2d Cir.1946) (holding that plaintiff failed to support his action based on unilateral error allegedly resulting from misrepresentation and fraud); *Fontenot v. Coreil*, 2 So.2d 97, 98 (La.App.1941) (refusing to reform a document signed by appellant who alleged that her nephew deceived her as to its contents; mutual mistake not pleaded).

22. The court held that although "a party cannot ordinarily obtain relief from an obligation in writing which he signs without reading it ... if both sides agree on a certain provision which is omitted from their written contract, the error is bilateral and it can be corrected". *Myers*, 587 So.2d at 822–23.

23. In so doing, we also reject Land's contention that the district court erred in reforming the ACS to the prejudice of the Richard S. Blossman Revocable Family Trust, which possesses a mortgage for the property at issue. Under Louisiana law, "an instrument may not be reformed or corrected to the prejudice of third parties who are authorized to rely on the integrity of the instrument, or who have relied on the public records". *First State Bank & Trust Co.*, 501 So.2d at 289. The Trust was a named defendant in the reformation action; however, it failed to argue or produce testimony as to prejudice or reliance. Accordingly, we decline to address a claim of prejudice when it has not been considered by the district court. *Independent Fire Insurance Co. v. Lea*, 979 F.2d 377, 379 (5th Cir.1992).

24. Timm testified that, "[a]bandonment would be contingent for (Blossman's) contract to come to fruition and his idea of owning all portions of the property".

September 19, 1986, one year after the fourth and final sale, IC filed for abandonment; this application was withdrawn on November 12, 1986. IC reapplied for abandonment in January 1991 (almost a year before trial), which the ICC subsequently granted.

### 1.

█ Land and Ruhl sued for reliance damages, based on IC's delay in applying for abandonment. In issue at trial was whether IC made representations as to *when* it would seek abandonment. Land argued that IC representatives told Blossman that IC would seek abandonment immediately after its commitment expired in 1986, and as assurance, agreed to enter into a lease of the property.

The district court simply did not believe Blossman and found that IC employees "did not make any representations as to when Illinois Central would seek ICC approval of its abandonment". Given the support for the court's credibility assessment discussed *supra*, and its unique role in making credibility choices, and based upon our independent review of the record, we do not find the district court's finding to be clearly erroneous.

Based on the finding that IC did not make representations as to when it would seek abandonment, we reject the claim for reliance damages on the basis of IC's delay in applying for abandonment. *See* LSA–C.C. art. 1967.[25]

25. Pursuant to LSA–C.C. art. 1967, there are three factors that establish detrimental reliance: (1) a representation to another party by conduct or words; (2) justifiable reliance on a representation by the other party; and (3) a change in position to the detriment of the other party. *Breaux v. Schlumberger Offshore Services, Inc.*, 817 F.2d 1226, 1230–31 (5th Cir.1987) *opinion reinstated*, 836 F.2d 1481 (5th Cir.1988). Obviously, where, as here, there is no representation, there can be no detrimental reliance.

26. In *National Safe*, 371 So.2d at 795, the court stated,

[W]e are reminded that not all obligations arising out of contract need be explicitly stated. Into all contracts, therefore, good faith performance is implied. Furthermore, every-

### 2.

█ Of course, to say that IC did not make any representations as to when it would apply for abandonment is not to say that IC was free from the obligation to apply for abandonment. Under Louisiana law, IC had a good faith obligation to carry out the purposes of its contract. *See National Safe Corp. v. Benedict & Myrick, Inc.*, 371 So.2d 792 (La.1979);[26] *see also* LSA–C.C. art. 1768 (stating contractual conditions may be implied). The parties were well aware that abandonment was necessary for Land and Ruhl to fulfill their purpose for purchasing the real estate; therefore, IC was obligated to attempt to abandon the property within a reasonable period of time. Whether IC adhered to its obligation is not a question we will address on appeal, because Land did not raise this issue before the district court; we therefore consider it waived. *See Independent Fire Ins.*, 979 F.2d at 379.[27]

### C.

█ We turn now to the final contention—that the district court erred in denying Land and Ruhl reimbursement for expenses they incurred in maintaining IC's sight zones. The language at issue is contained in the ACS for the third sale, dated January 30, 1985, which transferred the outer 75 feet for most of the line, *see supra* note 6:

VENDEE shall not do, or allow to be done, any act *or omission* that will, from

thing that by equity is considered incidental to the particular contract, or necessary to carry it into effect, is also a part of all agreements.

27. Land based its claim solely on a theory of detrimental reliance arising from specific representations allegedly made by IC. It did not present the legal argument now raised on appeal that IC violated an implied duty to act in good faith. In any event, even if we were to consider this issue, we would conclude that IC did not violate its implied duty to apply for abandonment within a reasonable period of time. IC's implied duty stemmed from its contract with Land, the very basis of which was in dispute. IC also presented a valid reason for withdrawing its initial application for abandonment.

and after the date of this Conveyance, create an obstruction of the sight zones, over and across all portions of the premises herein above conveyed that are situated adjacent to all public and private grade crossings.... Such sight zones are to provide a clear view between rail, pedestrian and vehicular traffic approaching the above mentioned existing grade crossings.

(Emphasis added.) The district court held that appellants are not entitled to recoup expenses from IC, because this provision obligates Land to clear and maintain the sight zones.[28]

Land asserts that the district court erred by reading the language to mean that Land has an affirmative obligation to maintain unobstructed sight zones: "[t]he proper reading of this section is that R.R. Land agreed not to do anything 'that would create an obstruction of the sight zones.' Any obstruction that occurred as a result of factors not of its creation are not the subject of the clause". Alternatively, it contends that the phrase is ambiguous and therefore justifies a further search for the parties' intent. *See* LSA–C.C. art. 2053 ("A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties").

We agree with the district court that the language unambiguously imposes an affirmative obligation on Land to maintain unobstructed sight zones. Although the provision may be poorly worded, this does not constitute ambiguity or render the provision unclear. The language includes active language ("shall not do ... any act ... that will ... create an obstruction of the sight zones"), as well as passive language ("shall not ... allow to be done, any ... omission that will ... create an obstruction of the sight zone"), and therefore includes in clear and explicit terms both an obli-

gation to refrain from obstructing the sight zones, as well as an obligation to prevent external factors that result in obstruction of the zones. Accordingly, we conclude that the district court did not err in its interpretation of the provision.

Nor did the district court err in failing to consider extrinsic evidence. Pursuant to LSA–C.C. art. 2046, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent". Because we conclude that the language of the provision is clear and explicit and does not lead to absurd consequences, we, like the district court, may not consider extrinsic evidence to discern intent. The district court did not err in rejecting this claim for damages.

### III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

28. The district court stated,

Contrary to R.R. Land's contention, this language in fact obligates R.R. Land, vendee, to clear and maintain the sight zones. It prohibits R.R. Land from placing or permitting to be placed, or failing to remove, any obstruction that arises by nature or otherwise, on the land and requires that it remove any that may be found there.