**Olga M. CAMPBELL, Plaintiff,**

v.

**AMERICAN PSYCHOLOGICAL ASSOCIATION, Defendant.**

**No. MO–99–CA–16.**

United States District Court,
W.D. Texas,
Midland–Odessa Division.

May 25, 1999.

C. H. Brockett, Jr., Brockett & Lindemood, Midland, TX, for Olga M. Campbell.

Michael B. McKinney, Stubbeman, McRae Et Al, Midland, TX, Barbara Bauernfeind, Stubbeman, McRae, Sealy Et Al., Midland, TX, Kit A. Pierson, Heller, Ehrman, White & McAuliffe, Washington, DC, Nathalie Gilfoyle, American Psychological Assoc., Washington, DC, for American Psychological Association.

## *ORDER*

BUNTON, District Judge.

**BEFORE THE COURT,** in the above-captioned cause of action, are Defendant American Psychological Association's Motion to Dismiss, filed January 29, 1999; Plaintiff Olga M. Campbell's Response in Opposition to Defendant's Motion to Dismiss, filed February 11, 1999; Defendant's Reply in Support of Motion to Dismiss, filed February 22, 1999; Defendant's Motion for Summary Judgment, filed April 27, 1999; Plaintiff's Response to Defendant's Motion for Summary Judgment, filed May 11, 1999; and Defendant's Reply in Support of Summary Judgment Motion, filed May 19, 1999. With trial set for June 1, 1999, the Court will apply a summary judgment standard and consider Defendant's Motion to Dismiss together with Defendant's Motion for Summary Judgment. Thus, after due consideration, the Court is of the opinion that the following Order is appropriate.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *see Hansen v. Continental Ins. Co.,* 940 F.2d 971, 975 (5th Cir.1991); *Hogue v. Royse City,* 939

F.2d 1249, 1252 (5th Cir.1991). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED.R.CIV.P. 1).

"All facts contained in the pleadings, depositions, admissions, and answers to interrogatories are reviewed by 'drawing all inferences most favorable to the party opposing the motion.'" *James v. Sadler*, 909 F.2d 834, 836 (5th Cir.1990) (quoting *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986)); *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 474 (5th Cir.1989); *Moore v. Mississippi Valley State Univ.*, 871 F.2d 545, 549 (5th Cir. 1989); *Degan v. Ford Motor Co.*, 869 F.2d 889, 892 (5th Cir.1989). However,

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.

*Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190–91 (5th Cir.1991) (quoting FED. R.CIV.P. 56(e)).

Accordingly, the focus of this Court is upon disputes over material facts; that is, only facts likely to affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987). The Fifth Circuit has stated, "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the record evidence before the court." *James*,

909 F.2d at 837; *see Matsushita Elec. Industr. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) (en banc).

■ Rule 56(c) does not "require[ ] that an oral hearing be held on a motion for summary judgment." *McMillian v. City of Rockmart*, 653 F.2d 907, 911 (5th Cir. 1981); *see* FED.R.CIV.P. 78; Local Court Rule CV–7(h). However, this Court has demonstrated its willingness to allow a nonmoving party a day in court in borderline cases where, under the governing law or reasonable extensions of existing law, the hearing of some testimony would be helpful to understanding the proper application of the law. Such is not the situation in the case at bar.

## II. FACTUAL BACKGROUND

The instant case resembles a script for some bawdy television soap opera, replete with issues of sex,. intimacy, and broken trust. The Plaintiff, Olga Campbell, is a doctor of psychology practicing in Midland County, Texas. The Defendant, the American Psychological Association ("APA"), is a non-profit professional organization in which Campbell was a voluntary member until her membership was terminated in June of 1995.

Basically, Campbell alleges that the APA wrongfully expelled her from the APA's membership roster for violating the organization's ethics rules, prohibiting dual relationships between psychologists and their patients. In this case, the dual relationship allegedly occurred when Campbell engaged a couple in marital counseling although she maintained a close personal friendship with them and once had a sexual relationship with the husband prior to his marriage. Based upon the APA's decision to terminate her membership, Campbell now alleges state causes of action against the APA for intentional infliction of emotional distress, libel, and slander per

se.[1] The APA's decision, Campbell contends, has caused her severe emotional distress and greatly damaged her psychology practice. The APA, however, argues that Campbell's Complaint and the summary judgment evidence fail to support her state-law claims.

### A.  A "Casual" Affair

This story begins nearly two decades ago in the social meetings of the local MENSA[2] organization of Midland, Texas. In 1980, Campbell first met Robert Volkmann through MENSA. In 1981 and 1982, Campbell was involved in a "casual" sexual relationship with Robert Volkmann. *Def.'s Mot.Summ.J.Ex. A* ("Campbell Dep.") at 207–08. When their sexual encounters ended, Campbell and Robert Volkmann maintained a friendship which continues to the present. Both are still MENSA members see each other six times a month at MENSA gatherings. *Campbell Dep.* at 100. In 1984, while Robert Volkmann and she were still friends, Campbell became licensed to practice psychology in Texas by the Texas State Board of Examiners of Psychologists.

When Robert Volkmann began dating Laura Volkmann, Campbell also became close friends with her. In November of 1990, Campbell served as the maid of honor at the Volkmanns' wedding and believed that she was Laura Volkmann's "closest friend." *Id.* at 57–58; *Pl.'s Exh. C* ("L. Volkmann Dep.") at 193. In her numerous lunches and social meetings with Laura

Volkmann, Campbell even revealed intimate and troubling details[3] of her life to Laura Volkmann. *Campbell Dep.* at 367–69. Nevertheless, Campbell states that she never told Laura Volkmann that she had been sexually involved with Robert Volkmann. *Id.* at 78–79, 148–50, 376–77.[4]

### B.  A Helpful Friend

In April of 1992, the Volkmanns began experiencing trouble in their marriage. After unsuccessful marital counseling attempts with other counselors, the Volkmanns sought out and retained Campbell to help them. Even before therapy began, however, Campbell was aware that the Volkmanns were experiencing trouble in their marriage. For example, through her close friendship with Laura Volkmann, Campbell had learned that Robert and Laura Volkmann's "sexual relationship ended about the point that they got engaged." *Campbell Dep.* at 61–63. In fact, although she did not inform Laura Volkmann that she had been sexually intimate with Robert Volkmann and had no reason to believe that Laura Volkmann was aware of the sexual relationship, Campbell counseled the Volkmanns about problems with their sex life and physical intimacy, such issues forming a major part of the Volkmanns' sessions. *Id.* at 149–50, 349.

Meanwhile, outside of the therapy sessions, Laura Volkmann received a master's degree in psychology and had gained some knowledge of the ethical principles psychologists must follow. *L. Volkmann*

---

1. On April 19, 1999, this Court allowed Campbell to file Plaintiff's First Supplemental Original Complaint ("Supplemental Complaint") which added a libel cause of action to the case at bar. Campbell's Supplemental Complaint, however, did not materially change the factual allegations in the original Complaint.

2. MENSA is an international society of individuals scoring in the top two percent of the population on a standardized intelligence test.

3. Many of these details have been filed under seal and have no particular relevance to the legal issues in this case.

4. In her deposition, Campbell states that she thought it was not her obligation to reveal to Laura Volkmann that she once had a sexual relationship with her husband:

   "I'm really not required to divulge that kind of information to anybody. I didn't give [Laura Volkmann] names. We talked about sex and maybe what we'd done and what we wanted to do, but I never named names, including Robert Volkmann.... My view, as I gave in the other deposition, was that it was Robert's information to share with his wife if he chose, and it wasn't my information to share."

   *Campbell Dep.* at 376–77.

*Dep.* at 143, 240. She understood that she was entering a "dual relationship" with Campbell, but she also "believed 100 percent that [Campbell] knew more than [she] did, and that [Campbell] must be right and [she] must be wrong at that time." *Id.* at 241. The sessions appeared to be productive. In fact, while still Campbell's patient, Laura Volkmann performed "marketing work" to promote Campbell's practice. *Campbell Dep.* at 156 (the Volkmanns were clients until August 20, 1993), 296. Campbell agreed to give Laura Volkmann five percent of new business generated by the marketing work. *Id.* at 167. Moreover, whether Laura Volkmann may have actually known of Campbell's prior sexual relationship with her husband remains uncertain. Robert Volkmann states that, although he may have not specifically told Laura Volkmann that he had been "sexually" intimate with Campbell, he did inform her that he once had a "dating" relationship with. Campbell prior to their marriage. *Pl.'s Resp. Mot.Summ.J.Ex. B* ("R. Volkmann Dep.") at 41–1. According to Robert Volkmann, Laura Volkmann had surmised that he once had a sexual relationship with Campbell because of information she provided to others. *R. Volkmann Aff.* at 41–2. In any case, Laura Volkmann did know that Campbell sustained a close friendship with Robert Volkmann through MENSA. *Hansen Dep.* at 237–38. Finally, in August of 1993, the Volkmanns successfully completed their marital counseling and ended their therapeutic relationship with Campbell. The Volkmanns already had one child, a girl, and they considered having another child after counseling. *R. Volkmann Aff.* at 41–1.

Nevertheless, nearly one year later in May or June of 1994, Laura Volkmann served Robert Volkmann with divorce papers, and the Volkmanns finally divorced on October 31, 1994. In their divorce, the Volkmanns maintained joint custody over their daughter. In April of 1995, however, Laura Volkmann lodged a complaint with Child Protective Services ("CPS") that Robert Volkmann had sexually abused their daughter. *L. Volkmann Dep.* at 275. To discuss this situation, Laura Volkmann once again became Campbell's client for a therapy session on April 19, 1995. *Campbell Dep.* at 132. In this session, Campbell still did not reveal her past sexual relationship with Robert Volkmann. *Id.* at 78–79. Subsequently, Laura Volkmann contends that she eventually learned through CPS investigations that Campbell once had a sexual relationship with her husband, Robert Volkmann. Because of this revelation, Laura Volkmann then filed an ethical complaint against Campbell with the APA. Robert Volkmann, however, denied giving such information to CPS. *R. Volkmann Aff.* at 41–2. As a different factual scenario, Campbell's Complaint alleges that Laura Volkmann had asked Campbell to testify against Robert Volkmann in the Volkmanns' child custody proceedings. According to Campbell, her refusal to testify against Robert Volkmann led to the filing of the ethics complaint with the APA.

### C. The Final Act: A Matter of Interpretation

In June of 1995, Laura Volkmann filed a complaint with the APA that Campbell had violated the APA's ethics standards in Principle 6.a of the APA's 1989 Ethical Principles of Psychologists Code ("1989 Amended Code") and Standard 1.17(b) of the APA's 1992 Ethical Principles of Psychologists and Code of Conduct ("1992 Ethical Principles"). Together, Principle 6.a and Standard 1.17(b) essentially prohibit APA psychologists from establishing dual relationships with their clients that could harm their clients and impair a psychologist's effectiveness.[5]

---

5. Principle 6.a of the 1989 Amended Code states:

   Psychologists are continually cognizant of their own needs and of their potentially influential position *vis-à-vis* persons such as

In her Complaint, Campbell states that her violation of Principle 6.a stemmed from her alleged "fail[ure] to avoid a prohibited dual relationship with Laura Volkmann by accepting her and her husband as clients in April 1992, even though [Campbell] was aware of the long established friendship between herself and both parties, and her prior sexual relationship with the husband." *Compl.* at 4. Furthermore, Campbell notes that her violation of Standard 1.17(b) stemmed from her decision to "resume[ ] her professional relationship with Laura Volkmann on April 19, 1995 in spite of [Campbell's] admitted reluctance to reestablish and [Campbell's] awareness of the long term relationship between herself and Laura Volkmann, as indicated by such things as their numerous social luncheons together after the original therapy ended in 1993, a hiking trip together, and Laura Volkmann's work on a marketing project for [Campbell]." *Id.* at 4–5.

Based upon Laura Volkmann's allegations, the APA's Ethics Committee ("Committee") recommended to the APA's Board of Directors that the APA should terminate Campbell's membership. To make their conclusions, the APA's Ethic's Office compiled a written record for the Committee. In this record, Campbell had no objection to the APA's procedures and had the opportunity to provide relevant evidence to the Committee in her defense. *Campbell Dep.* at 102–03. Campbell states that the Committee concluded that Campbell's violations were "blatant and repeated and occurred over a period of time." *Compl.* at 5. Campbell had apparently "failed to understand the general ethical issues regarding dual relationships" and "compromised her objectivity as a marital therapist with her prior history of a social/sexual relationship with one of the partners and a social relationship with both partners." *Id.* Furthermore, the Committee concluded that Campbell had "compromised the therapeutic relationship by maintaining an ongoing social relationship with the clients while engaging in therapy during two distinct therapeutic periods." *Id.* According to the Committee, Campbell "should have referred the couple to another mental health provider in the community." *Id.* As a consequence, the Committee recommended that Campbell's APA membership should be terminated and that the APA's decision should be presented to the Texas Board of Examiners of Psychologists, the Texas Psychological Association, the Association of State and Provincial Psychology Boards, the American Board of Professional Psychology, the Psychological Association of Greater West Texas, the Society of Personal Assessment, and the National Register of

clients, students, and subordinates. They avoid exploiting the trust and dependency of such persons. Psychologists make every effort to avoid dual relationships that could impair their professional judgment or increase the risk of exploitation. Examples of such dual relationships include, but are not limited to, research with and treatment of employees, students, supervisees, close friends, or relatives. Sexual intimacies with clients are unethical.
*1989 Amended Code,* 45 AMERICAN PSYCHOLOGIST 390, 393 (March 1990). Similarly, Standard 1.17(a) and (b) of the 1992 Ethical Principles states:
  (a) In many communities and situations, it may not be feasible or reasonable for psychologists to avoid social or other nonprofessional contacts with persons such as patients, clients, students, supervisees, or research participants. Psychologists must always be sensitive to the potential harmful effects of other contacts on their work and on those persons with whom they deal. A psychologist refrains from entering into or promising another personal, scientific, professional, financial, or other relationship with such persons if it appears likely that such a relationship reasonably might impair the psychologist's objectivity or otherwise interfere with the psychologist's effectively performing his or her functions as a psychologist, or might harm or exploit the other party.
  (b) Likewise, whenever feasible, a psychologist refrains from taking on professional or scientific obligations when preexisting relationships would create a risk of such harm.
*1992 Ethical Principles,* 47 AMERICAN PSYCHOLOGIST 1597, 1601 (December 1992).

Health Service Providers in Psychology. *Def.'s Mot.Summ.J.Ex. C* ("Jones Aff.") at ¶ 6.

Before revoking Campbell's membership, however, Campbell presented her case to two more APA bodies. On October 31, 1997, Campbell presented her defense in a *de novo* review before an APA Formal Hearing Panel ("Panel"). Campbell appeared with counsel and was allowed to present witnesses. *Campbell Dep.*, at 292. Despite having the opportunity to present witnesses, Campbell elected not to cross-examine Laura Volkmann before the APA. *Id.* at 291–93. Notably, in two days of sworn testimony, Campbell herself told the Panel that (1) she had maintained a social relationship with both of the Volkmanns before, during, and after counseling; (2) she had a prior sexual relationship with Robert Volkmann which she never revealed herself to Laura Volkmann; (3) she believed that only Robert Volkmann had the responsibility to reveal this prior sexual relationship to Laura Volkmann; and (4) that her relationship with Laura Volkmann included serving as her maid of honor at the Volkmanns' wedding and employing her in a marketing project for her psychology practice. *Id.* at 293–96. With these admissions, the Panel upheld the Committee's recommendations.

On December 18, 1997, in the final step before the Committee's recommendations could be enforced, Campbell filed a written appeal to the APA's Board of Directors. The Board of Directors upheld the previous recommendations and Campbell's membership was eventually terminated. Furthermore, the APA notified the professional psychological organizations that Campbell's membership had been revoked because she had violated the APA's ethics rules.[6]

In Campbell's appeal to the APA's Board of Directors, Campbell objected to the Committee's strict interpretation of its ethical rules and noted that "Dr. Campbell did give statements before the Hearing Panel that she was aware of the dual relationship, but had absolutely no question in her mind that there was no risk of impairment of her professional judgment nor any risk of exploitation." *Compl.Ex. A* at 110–3. Furthermore, Campbell argued that the APA's decisions up to that point involved "proceeding[s] with such potential for adverse harm to a psychologist without the benefit of basic due process, including the right to confrontation of witnesses." *Id.* at 110–2. Thus, according to Campbell, the APA violated her due process rights under the United States and Texas Constitutions. *Compl.* at 6. Campbell alleges that the APA's hearing panel had "ignored verified evidence" and that it relied upon Laura Volkmann's unsworn statements although "there is no evidence in the record that [Campbell] was impaired in her professional judgement [sic] in any way or exploited Laura Volkmann in any way." *Compl.* at 6. However, Campbell did not make any other procedural objections. The Court now examines whether a genuine issue of material fact exists to preclude granting summary judgment in this case.

## III. DISCUSSION

After extensive discovery in this cause of action, Campbell's primary contention for denying summary judgment and allowing the present causes of action for intentional infliction of emotional distress, libel, and slander to go to trial is that a genuine issue of material fact exists regarding whether Campbell actually violated the APA's ethics rules. *Pl.'s Resp. to Def.'s*

---

**6.** The APA's notification stated:

This is to inform you that the American Psychological Association took the following action:

*Expelled From Membership*

Olga M. Campbell, Ph.D., (known state of residence or practice—Texas; date of birth listed as 6/20/43 in the 1997 APA Directory); based on violation of Principle 6.a of the 1989 Amended Ethics Code and Standard 1.17(b) of the 1992 Ethics Code. *Jones Aff.* at ¶ 15.

*Mot.Summ.J.* at 10, 15–17. Underlying this general contention, Campbell points out that questions of fact exist regarding (1) whether Laura Volkmann had knowledge of Campbell's past sexual relationship with Robert Volkmann prior to Campbell's decision to engage the Volkmanns in marital counseling, and (2) whether the APA adequately investigated Laura Volkmann's APA complaint against Campbell. *Id.* at 15, 13. However, this Court concludes that Campbell's stated reasons for surviving summary judgment are insufficient as a matter of law and that summary judgment should be granted for the APA.

### A. Intentional Infliction of Emotional Distress

■ In this case, the APA requests dismissal of Campbell's claim for intentional infliction of emotional distress because Campbell's Complaint fails to allege, and the summary judgment evidence fails to support, that the APA engaged in "extreme and outrageous conduct" when it decided to terminate her APA membership. The Court agrees. Under Texas law, a plaintiff establishes a claim for intentional infliction of emotional distress by proving "that 1) the defendant acted intentionally or recklessly, 2) the conduct was 'extreme and outrageous,' 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the resulting emotional distress was severe." *Standard Fruit and Vegetable Co., Inc. v. Johnson*, 985 S.W.2d 62, 1999 WL 2550, at *4 (Tex.1998); *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993).

### 1. "Extreme and Outrageous" Conduct?

■ "Whether a defendant's conduct is extreme and outrageous is a question for the court to determine." *Hogan v. The Hearst Corp.*, 945 S.W.2d 246, 251 (Tex.Ct. App.—San Antonio 1997); *Wornick*, 856 S.W.2d at 734. In making its determination, a court considers that "[o]utrageous conduct is that which '[goes] beyond all possible bounds of decency, and to be re-garded as atrocious, and utterly intolerable in a civilized community.'" *Wornick*, 856 S.W.2d at 734 (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d (1965)). For example, in *Diamond Shamrock Refining and Marketing Co. v. Mendez*, 844 S.W.2d 198 (Tex.1992), the Texas Supreme Court held that a former employer's *false* accusations in the community that the plaintiff was fired from his job because he was a thief were not sufficiently outrageous to support an intentional infliction of emotional distress claim. *Id.* at 202. Furthermore, in *Halbert v. City of Sherman*, 33 F.3d 526 (5th Cir.1994), the Fifth Circuit Court of Appeals held that "merely calling the police and informing them that someone is intoxicated or using drugs is not sufficiently outrageous conduct to warrant the recovery of damages for the intentional infliction of emotional distress *even if those statements are false.*" *Id.* at 529 (emphasis added).

■ In the case at bar, the Court finds that the APA's alleged conduct was not sufficiently extreme and outrageous to support an intentional infliction of emotional distress claim. Even if the APA falsely depicted Campbell as having violated its ethics rules, the APA's behavior was similar to the behavior of the defendants in both *Diamond Shamrock* and *Halbert* where the Texas Supreme Court and the Fifth Circuit held that the defendants did not engage in extreme and outrageous conduct even after having made false accusations about *criminal* conduct against the plaintiffs in the community and to the police. Far worse for Campbell in the instant case, however, is that her Complaint and her own affidavit and sworn deposition testimony clearly show that she did engage in "dual" relationships with both Robert and Laura Volkmann. These were the relationships upon which even Campbell acknowledges in her Complaint that the APA focused when it decided to terminate her APA membership and publish that information to various professional psychological organizations.

### 2. "Exercising Its Legal Rights"?

▐ Furthermore, because "extreme and outrageous" conduct falls outside society's norms, "[t]here is no liability for intentional infliction of emotional distress where an actor was exercising his legal rights." *Brandes v. Rice Trust, Inc.*, 966 S.W.2d 144, 147 (Tex.Ct.App.—Hous. 14 Dist.1998); *see Hogan*, 945 S.W.2d at 251 (defendant-newspaper's publishing of names already in public record was not extreme and outrageous conduct as matter of law). In this case, Campbell's intentional infliction of emotional distress claim really attacks the APA's procedures and interpretation of its own rules leading up to Campbell's expulsion from the APA. Campbell argues that the APA's actions constituted extreme and outrageous conduct because they violated her due process rights under the United States and Texas Constitutions. Yet, although Campbell may have understandably disagreed with the APA's strict interpretation of its ethics rules and its "death penalty" enforcement of those rules, the Court finds that the APA was clearly acting within its legal rights and as a matter of law did not engage in extreme and outrageous conduct sufficient to support an intentional infliction of emotional distress claim.

▐ Campbell's allegations and the summary judgment evidence are simply not enough to show that her "due process" rights were violated. For a plaintiff to adequately plead that a defendant has violated her procedural due process rights under the Texas and U.S. constitutions,[7] the plaintiff must establish that she was deprived of notice and an adequate opportunity to be heard with respect to a decision affecting a property or liberty interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Delahoussaye v. City of New Iberia*, 937 F.2d 144, 151 (5th Cir.1991) ("Procedural due process requires that an individual receive notice of a proposed action and an opportunity to present his side of the story."); *Univ. of Texas Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex.1995); *Texas Parks and Wildlife Dep't v. Callaway*, 971 S.W.2d 145, 151 (Tex.Ct.App.—Austin 1998); *Texas Employment Comm'n v. Remington York, Inc.*, 948 S.W.2d 352, 357 (Tex.Ct.App.—Dallas 1997) (appellate court considered federal and state due process claims together). Because the federal guarantee only applies to state action, however, the U.S. Constitution's Fourteenth Amendment due process clause does not apply to the APA in the instant case. *Delahoussaye*, 937 F.2d at 148; *Li v. Univ. of Texas Health Science Ctr. at Houston*, 984 S.W.2d 647, 653 (Tex.Ct.App.—Hous. 14 Dist.1998) (Texas appellate court affirmed granting of summary judgment on due process claim partly because private professional association of doctors was engaged in private conduct, not state action.). On the other hand, "[s]tate action is inapplicable to the analysis" when applying the *Texas* due process clause. *Hatley v. Am. Quarter Horse Ass'n*, 552 F.2d 646, 656 (5th Cir. 1977). Thus, the Texas due process clause does appear to "require something akin to traditional due process on the part of voluntary associations." *Hatley*, 552 F.2d at 656; *Burge v. Am. Quarter Horse Ass'n*, 782 S.W.2d 353, 356 (Tex.Ct. App.—Amarillo 1990) (Texas appellate

---

7. Article I Section 19 of the Texas Constitution provides that "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." TEX. CONST. ART. I § 19 (1997). The Fourteenth Amendment to the United States Constitution provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. CONST AMEND XIV, § 1. Although providing a right to "due course" of law, Article I Section 19 of the Texas Constitution is interpreted similarly to the "due process" clause of the United States Constitution. *Univ. of Texas Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995).

court concluded that American Quarter Horse Association did not deprive plaintiff of Texas due process); *Masonic Grand Chapter of E. Star v. Sweatt,* 329 S.W.2d 334, 337 (Tex.Ct.Civ.App.—Fort Worth 1959) (deprivation of pecuniary benefits by fraternal organization required due process analysis).

A Texas due process analysis of the actions of voluntary associations, however, is very deferential. Under a policy of non-intervention, "[i]t is well-established that the Texas courts will not interfere with the internal management of voluntary associations so long as the governing bodies of associations do not substitute legislation for interpretation and do not overstep the bounds of reason or violate public policy or the laws of [Texas] while doing so." *Burge,* 782 S.W.2d at 355; *Frey v. DeCordova Bend Estates Owners Ass'n,* 632 S.W.2d 877, 880 (Tex. Ct.App.—Fort Worth 1982), *aff'd,* 647 S.W.2d 246 (Tex.1983); *Hatley,* 552 F.2d at 656. Furthermore, "[t]he right of a voluntary club or association to interpret its own organic agreements, such as its charter, its by-laws and regulations, after they are made and adopted, is not inferior to its right to make and adopt them, and an individual, by becoming a member, subjects himself, within legal limits, to the association's power to administer as well as its power to make its rules." *Harden v. Colonial Country Club,* 634 S.W.2d 56, 59 (Tex.Ct.App.—Fort Worth 1982). Thus, the Texas policy of nonintervention also extends to an association's disciplinary procedures because members "impliedly agree to abide by the rules" when they decide to join a voluntary association. *Lawrence v. Ridgewood Country Club,* 635 S.W.2d 665, 667 (Tex.Ct.App.—Waco

1982); *Burge,* 782 S.W.2d at 355 (The appellate court held that plaintiff had "agreed to follow the rules and regulations and to be bound by decisions of the Executive Committee of the [American Quarter Horse Association] when he voluntarily became a member of the association."). Indeed, "[i]f the courts were to interfere everytime some member, or group of members, had a grievance, real or imagined, the non-profit, private organization would be fraught with frustration at every turn and would founder in the waters of impotence and debility." *Harden,* 634 S.W.2d at 60.[8]

In the case at bar, Campbell's factual allegations and the summary judgment evidence fail to support that the APA acted in an "extreme and outrageous" manner. Procedurally, assuming for purposes of this Motion that Campbell had a liberty or property interest in her APA membership, the Court finds that the APA provided Campbell with notice and an adequate opportunity to present her case to the APA. Campbell's Complaint does not allege and the evidence does not show that the APA actually violated one of its own procedures. *Lawrence,* 635 S.W.2d at 666 (no intervention unless club violates own rules). Nor does Campbell bring forth any specific facts showing that the APA was somehow biased against her and incapable of providing her with a fair hearing. *Warren v. Nat'l Ass'n of Secondary Sch. Principals,* 375 F.Supp. 1043, 1047 (N.D.Tex.1974). Instead, Campbell's Complaint and the summary judgment evidence show the opposite. Pursuant to the APA's procedures, Campbell appeared before the APA's Ethics Committee, a Formal Hearing Panel, *and* the APA's Board of Directors in order to present *her side of*

**8.** Texas is not the only state to treat voluntary organizations deferentially with regards to their internal affairs. *See Putka v. First Catholic Slovak Union,* 75 Ohio App.3d 741, 600 N.E.2d 797, 801–02 (Ohio App. 8 Dist.1991) (voluntary organization's decisions involving policy and discipline of members are final), *cert. denied,* 503 U.S. 986, 112 S.Ct. 1673, 118 L.Ed.2d 392 (1992); *McMahon v. Chicago Mercantile Exchange,* 221 Ill.App.3d 935, 164 Ill.Dec. 369, 582 N.E.2d 1313, 1320 (1991) (voluntary association need only treat members according to association's rules in a fair and impartial manner without affording all of due process protections in Federal Constitution).

*the story* before she was expelled from the voluntary organization. *Compl.* at 5–6; *Lawrence*, 635 S.W.2d at 667 (plaintiff's several opportunities to discuss his violations of club rules constituted sufficient process). Moreover, considering the APA's status as a voluntary professional organization and the civil nature of Campbell's expulsion from that organization, the Court finds that Campbell did not have any Sixth Amendment-type right to "confront" her accuser, Laura Volkmann, during the APA's internal disciplinary proceedings. *Faretta v. California*, 422 U.S. 806, 818, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (Sixth Amendment right of accused in *criminal* proceedings apply to the *States* through Fourteenth Amendment).

Indeed, Campbell herself did not attempt to call Laura Volkmann for questioning before the APA. Moreover, even without Laura Volkmann's presence during the APA's disciplinary procedures, the summary judgment evidence is clear that the APA made a reasonable decision falling short of being extreme and outrageous conduct. Pursuant to the APA's legal right to interpret its rules and discipline its members, the evidence establishes that Campbell and the APA simply had a genuine dispute over the interpretation of the APA's ethics principles and how those principles applied to Campbell's particular uncontradicted conduct. For example, although acknowledging that she had counseled clients with whom she had close friendships, Campbell's letter response to the APA's Board of Directors argued that Principle 6.a of the 1989 Amended Code "does not absolutely prohibit dual relationships." *Compl.Ex. A* at 110–3. Similarly, Campbell argued that a psychologist under Standard 1.17(b) "is not absolutely prohibited from taking on a professional obli-

gation with patients with whom they have a pre-existing relationship." *Id.* at 110–4. These conclusory statements, however, do not demonstrate that the APA's interpretation of its ethics code was in any way "arbitrary, fraudulent, or capricious." *Harden*, 634 S.W.2d at 59 (court would not intervene where set price of transfer fee for country club membership was not arbitrary, fraudulent, or capricious.).

APA members are clearly required to adhere to the APA's ethics codes as a condition of membership. *1989 Amended Code: Preamble*, 45 AMERICAN PSYCHOLOGIST 390 (March 1990); *1992 Ethical Principles: Introduction*, 47 AMERICAN PSYCHOLOGIST 1597, 1598 (December 1992). Moreover, one can reasonably interpret both Principle 6.a and Standard 1.17(b) as providing practically absolute prohibitions of Campbell's admitted actions. Principle 6.a requires that "[p]sychologists make *every effort* to avoid dual relationships that *could* impair their professional judgment or increase *the risk* of exploitation." *1989 Amended Code*, 45 AMERICAN PSYCHOLOGIST at 393 (emphasis added). Principle 6.a further notes that an "example[ ] of such dual relationships include[s] . . . treatment of . . . *close friends*." *Id.* (emphasis added). Similarly, Standard 1.17(b) requires that "*whenever feasible*, a psychologist *refrains* from taking on professional or scientific obligations when preexisting relationships would create a *risk* of such harm." *1992 Ethical Principle*, 47 AMERICAN PSYCHOLOGIST at 1601 (emphasis added).[9]

Thus, based upon a strict reading of its ethical principles, the APA was legally justified in expelling Campbell from its membership roster. Even if Laura Volkmann

---

**9.** Other membership obligations under the APA's ethics rules support the APA's strict interpretation of its ethics code. For example, Section 4.06 of the 1992 Ethics Principles requires that "Psychologists *do not accept* as therapy patients or clients persons with whom they have engaged in sexual intimacies." *1992 Ethical Principles*, 47 AMERICAN PSYCHOLOGIST at 1605 (emphasis added). In addition, Section 1.14 of the 1992 Ethics Principles requires that "[p]sychologists take reasonable steps to *avoid* harming their patients or clients." *1992 Ethical Principles*, 47 AMERICAN PSYCHOLOGIST at 1601 (emphasis added).

had knowledge of Campbell's sexual intimacy with Robert Volkmann,[10] Campbell had no way of knowing that Laura Volkmann was aware of the prior sexual relationship at the time she served as the Volkmanns' therapist. In fact, the summary judgment evidence shows that Campbell herself never even believed that she had any professional obligation to fully inform Laura Volkmann about her prior sexual relationship with Robert Volkmann. She placed that burden solely upon her patients. Although Campbell argues that her marital counseling sessions with the Volkmanns ended successfully, such counseling was conducted without the Volkmanns' *fully informed* consent to proceed. Thus, the APA's expulsion of Campbell was based on undisputed evidence that Campbell had engaged in prohibited dual relationships with the Volkmanns without regard to their possible harmful results. Indeed, Campbell's own Complaint reveals that (1) the Volkmanns eventually divorced; (2) Campbell's apparent friend and former client, Laura Volkmann, had sought Campbell's help in the Volkmanns' child custody case; and that (3) Campbell had refused to testify against Robert Volkmann, a man who had been Campbell's sexual partner, friend, and client.[11] Applying the APA's ethics code to such undisputed facts, the APA could have reasonably concluded that Campbell, the professional psychologist ultimately responsible for her own actions, did not properly evaluate the risk of harm involved in counseling the Volkmanns and did not herself take reasonable steps to avoid such harm. That particular conclusion and the means by which the APA reached it did not constitute extreme and outrageous conduct. Therefore, Campbell's intentional infliction of emotional distress claim will be dismissed.

## B. Libel and Slander Per Se

■■■■ Under Texas law, libel and slander differ only in the medium of expression. The Texas Legislature defines a libel as:

> ... a defamation expressed in *written or other graphic form* that tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury.

TEX.CIV.PRAC. & REM.CODE § 73.001 (1997) (emphasis added); *Halbert,* 33 F.3d at 530. However, a "[s]lander is a defamatory statement *orally* communicated or published to a third person without legal excuse." *Burch v. Coca–Cola Co.,* 119 F.3d 305, 323 (5th Cir.1997) (internal quotations and citations omitted, emphasis added), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998). Furthermore, "[b]ecause all words are not actionable, a plaintiff must prove either special damages (slander per quod) or that the words impute the commission of a crime, injure the plaintiff officially, professionally, or occupationally, or impute unchastity to a woman (slander per se)." *Plumley v. Landmark Chevrolet, Inc.,* 122 F.3d 308, 310 (5th Cir.1997) (citations omitted). For both libel and slander cases, whether "words are reasonably capable of the defamatory meaning the plaintiff attributed to them is a question of law for the trial court .... [which] must be considered in context and in light of the circumstances

---

**10.** There is no indication that Campbell even presented this possibility to the APA's governing body.

**11.** Despite her claims of objectivity, Campbell's many roles in the lives of Robert and Laura Volkmann have certainly tainted the credibility of her expert opinion in matters

regarding the Volkmanns. Professional psychologists have important obligations to fulfill. One of their most important roles is the ability to provide state family courts with reliable expert opinion so that a court may act in the best interests of a child.

surrounding its publication." *Burch,* 119 F.3d at 325–26. Moreover, in Texas, truth is an affirmative defense to both libel and slander causes of action. Tex.Civ.Prac. & Rem.Code § 73.005 (1997); *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995); *Hardwick v. Houston Lighting and Power Co.,* 943 S.W.2d 183, 184–85 (Tex.Ct.App.—Hous. 1 Dist.1997).

In the instant case, Campbell argues that the libelous and slanderous statements constituting her two defamation claims falsely assert that she violated the APA's ethics principles. *See* Part II. C. *supra* Footnote 6 (notification of APA action). As a matter of law, however, the Court finds that the APA's statements were truthful, and therefore Campbell's libel and slander claims cannot survive a summary judgment motion.[12] The falsity of the APA's statements naturally depends upon the legitimacy of the APA's interpretation of its own ethics codes applied to Campbell's particular circumstances. As discussed earlier, the APA lawfully interpreted its ethical codes as requiring a level of conduct beyond that which Campbell executed in her dealings with the Volkmanns. The APA's statements could not have been false and defamatory. Accordingly, Campbell's claims for libel and slander will be dismissed.

In the alternative, this Court holds that the APA's communications were privileged as a matter of law and not subject to Campbell's libel or slander claims. Under Texas law, "[a]s a defense to libel or slander, a qualified privilege extends to communications made in good faith on a subject in which the author has an interest or duty to another person having a corresponding interest or duty." *Hooper v. Pitney Bowes, Inc.,* 895 S.W.2d 773, 777 (Tex. Ct.App.—Texarkana 1995) (citing *Dixon v. Southwestern Bell Telephone Co.,* 607 S.W.2d 240 (Tex.1980)); *Burch,* 119 F.3d at 323–25 (Texas law recognizes common-

interest privilege in defamation cases). "Qualified privilege is lost, however, if the defamatory statement is in any degree actuated by malice." *Marathon Oil Co. v. Salazar,* 682 S.W.2d 624, 630 (Tex.Ct. App.—Hous. 1 Dist.1984). In a libel or slander suit, malice is essentially "publication with the knowledge that the communication was false or with reckless disregard for whether it was false." *Id.* at 631.

In the instant case, the summary judgment evidence is clear that the allegedly libelous and slanderous statements authored by the APA were published to APA members and to professional psychological organizations. These organizations had a clear common interest in maintaining the integrity of the psychology profession. Thus, the APA is authorized to inform these organizations when it concludes that one of its members has acted unethically. Furthermore, the summary judgment evidence fails to show that the APA may have acted maliciously. On the contrary, the evidence demonstrates that the APA acted in good faith, methodically investigating the allegations against Campbell before publishing its conclusions to other interested persons or organizations.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** Defendant American Psychological Association's Motion for Summary Judgment is hereby **GRANTED.** Costs are assessed against the Plaintiff.

**IT IS FURTHER ORDERED** that all pending motions are hereby **DENIED AS MOOT.**

---

12. *Although Campbell uses the APA's written notifications that she had violated the APA's ethics rules to support her libel claim, Camp-* bell has not provided the Court with any oral statements to support a slander claim.